**Dror Haim GOLDBERG, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–00–00628–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 22, 2002.

Publication Ordered Aug. 22, 2002.

Dick DeGuerin, Matt Hennessy, DeGuerin & Dickson, Houston, for appellant.

Alan Curry, Assistant District Attorney, Houston, for state.

Panel consists of Chief Justice SCHNEIDER and Justices TAFT and RADACK.

## OPINION

MICHAEL H. SCHNEIDER, Chief Justice.

A jury convicted appellant, Dror Haim Goldberg, of murder and assessed punishment at 45 years confinement and a $10,000 fine. We affirm. In 51 points of error, appellant contends the trial court erred by: (1) denying his motion to suppress evidence because he was illegally arrested; (2) admitting evidence that was both irrelevant and unduly prejudicial; (3) admitting evidence obtained as a result of a school search that took place three years before the offense; (4) admitting irrelevant letters that appellant wrote to a friend two years before the offense; (5) permitting witnesses to identify appellant at trial after they had viewed impermissibly suggestive line-ups; (6) admitting statements that appellant made to German police officers when he was taken into custody; (7) allowing the State to use its peremptory strikes to exclude women from the jury; (8) violating the rule of "optional completeness" by not allowing appellant to introduce the entire statement he made to police after the State introduced other portions of the same conversation; and (9) permitting the State to comment on appellant's decision not to testify. We affirm.

## BACKGROUND[1]

In the late morning or early afternoon of November 27, 1998, a young, white male entered a wig shop at the Weslayan Plaza

---

1. We begin with a brief, general statement of facts. Additional facts will be presented as they become necessary to a discussion of the issues raised by appellant.

Shopping Center in Houston, Texas. He walked in, looked around, and left without talking to either Manuela Silverio or Roberta Ingrando, both of whom were working there that day.

At just before 4 p.m. the same day, the same man returned to the wig shop. Mrs. Ingrando saw the man walk up to Ms. Silverio and "punch" her in the neck, so Mrs. Ingrando ran to call the police. The man cut Mrs. Ingrando's wrist, knocking the phone from her hands. He then stabbed her several times, asking her, "Do you like it?" He also told her that he was going to cut her nose and ears and make her pretty. Mrs. Ingrando's husband, Roland, who was working in the back of the store, ran to the front when he heard his wife screaming. Mr. Ingrando threw a tray of hair rollers at the assailant, and then wrestled with the assailant briefly, sustaining several cuts during the struggle. The assailant fled the store.

At the same time, Dr. Randall Beckman was leaving a pet store across the parking lot after purchasing dog food. Dr. Beckman saw the assailant running across the parking lot. Thinking that someone might need assistance, Dr. Beckman got into his car and followed the man across the parking lot. Dr. Beckman saw the man get into a dark Lincoln Navigator and back out of a parking space. Dr. Beckman then passed the Navigator in the parking lot and was able to clearly see the driver, as the two vehicles passed driver's side window to driver's side window. After passing the Navigator, Dr. Beckman turned around and wrote down the license plate of the Navigator.

Dr. Beckman then parked in front of the wig shop and went inside to see if anyone needed his help. He found Manuela Silverio lying in a pool of blood on the floor and Mr. and Mrs. Ingrando hysterically trying to telephone the police. Dr. Beck-

man tried to revive Silverio, but she was dead. Mr. and Mrs. Ingrando were taken to the hospital. Mr. Ingrando's injuries were minor, and he was soon released. However, Mrs. Ingrando required surgery and was hospitalized for at least a week.

Dr. Beckman was interviewed at the scene of the crime, and he gave the police the paper upon which he had written the license plate number of the Navigator. He also described the assailant as a white male, approximately six feet tall, 18–19 years old, 165 pounds, with short-to-medium sandy blonde hair.

The police ran the license plate number provided by Dr. Beckman and discovered that it was registered to Loren Nelson, who lived nearby at 2202 Dunstan. Loren Nelson, now Loren Goldberg, lived with appellant's father at that address. Several officers drove to the 2202 Dunstan address and located the Navigator in a covered parking area behind the house. One of the officers touched the hood of the Navigator and it was still warm, but no one was at home at the residence except the housekeeper, Marleny Vilorio. Ms. Vilorio told the officers that Dr. Goldberg and Loren Nelson were out of town and that appellant, Dror Goldberg, had been left in charge of the house. The keys to the Navigator were in the house.

At 6:07 p.m., appellant drove up to 2202 Dunstan in his white pick-up truck. Officer M.L. Sampson approached appellant and asked if he were Dror Goldberg. Appellant said that he was, and Officer Sampson handcuffed him, performed a pat-down search, and informed appellant of his rights. Appellant indicated that he understood his rights and indicated that he would be willing to talk with the officer.

Appellant was later uncuffed, and he talked with the police about his whereabouts that day. He also executed consent

forms for the police to search: (1) his father's residence at 2202 Dunstan, (2) appellant's own white pick-up truck; and (3) appellant's apartment at 4301 Bissonnet. While at 2202 Dunstan, police noticed blood on appellant's shirt and a red mark on his chest. They also seized the Navigator and had it towed to the police station, where it was later searched pursuant to a warrant.[2] Before searching 2202 Dunstan, the police took a Polaroid photo of appellant.

At 8:07 p.m., the police completed their search at 2202 Dunstan and transported appellant to the police station. During the ride to the police station, appellant told the police officer that the Navigator had been stolen in the past, but that every time it was stolen, the thief always just returned it. At the police station, appellant gave police his finger and palm prints. He also executed a waiver of the presence of an attorney and participated in a videotaped line-up. At approximately 11:00 p.m., appellant was released and went home with his mother.

Meanwhile, at 8:30 p.m., Dr. Beckman looked at a photo array containing the Polaroid taken of appellant and indicated he was 80% certain that appellant was the man he had seen running from the wig shop. Dr. Beckman and Mrs. Ingrando were later shown the videotaped line-up and both identified appellant as the assailant.

Appellant was indicted on February 17, 1999, but efforts to arrest him were fruitless because he had left the country. A federal warrant was issued for his arrest, and he was arrested at the Frankfurt Airport in Germany on June 21, 1999.

## A. Motion to Suppress Evidence Obtained as a Result of November 27, 1998 Searches

In points of error one through nine, appellant contends that he was arrested at 6:07 p.m., the moment he approached the house at 2202 Dunstan and was handcuffed. He argues that, because there was no probable cause to arrest him at that time, the trial court should have suppressed all evidence seized at 2202 Dunstan, from appellant's pick-up truck, and from appellant's apartment.[3] Appellant also contends that the photo and video line-ups should be suppressed because they, too, were fruits of his illegal arrest.

### 1. Standard of Review

When a motion to suppress is presented, the trial court is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App.1997). The appellate court's only role is to decide whether the trial court improperly applied the law to the facts. *Williams v. State,* 937 S.W.2d 23, 26 (Tex.App.-Houston [1st Dist.] 1996, pet. ref'd, untimely filed). Unless the trial court clearly abused its discretion, we will not disturb its findings. *Rivera v. State,* 808 S.W.2d 80, 96 (Tex. Crim.App.1991); *Williams,* 937 S.W.2d at 26.

Further, the appellate court affords nearly complete deference to the trial court's rulings on "mixed questions of law

---

**2.** Fibers matching wigs at the wig shop were recovered from the Navigator.

**3.** Appellant asserts in his brief that "no evidence that was connected to the wig shop incident" was recovered from either 2202 Dunstan, appellant's apartment, or appellant's pick-up. However, the record shows that the police recovered: (1) a blood-stained shirt, which appellant was wearing at the time (the blood was his own); (2) two knives from appellant's pick-up; and (3) clothing that was similar in appearance to that worn by the assailant from appellant's apartment.

and fact," such as probable cause and reasonable suspicion, where the resolution of those questions turns on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 89. Accordingly, the appellate court reviews the evidence in the light most favorable to the ruling of the trial court. *Id.; Taylor v. State*, 945 S.W.2d 295, 297 (Tex.App.-Houston [1st Dist.] 1997, pet. ref'd) (applying standard and reversing trial court).

*2. Facts Relating to the Seizure[4] of Appellant*

At approximately 4:24 p.m. on the day of the murder, officers on the scene at the wig shop determined that the Navigator seen by Dr. Beckman was registered to Loren Nelson, who lived at 2202 Dunstan. Several of the uniformed officers left the wig shop and drove to the Dunstan address, where they found the Navigator parked in an open carport behind the house. The carport opened on to a public alley behind the residence and the license plate was clearly visible from Shepard Street. One of the officers walked up to the Navigator, felt it, and determined that the hood was still warm. Homicide detective Mike Sampson was dispatched to the Dunstan address and arrived at 5:45 p.m. His purpose in going there was to seize the Navigator and question the maid.

Sampson talked to the maid, Marleny Vilorio, and she told him that Loren Nelson and Dr. Goldberg were on vacation, but that their son, Dror, had been left in charge. As the officer was talking with Vilorio, appellant drove up to the residence in his white pick-up truck, got out, and approached the officers. He was wearing a white t-shirt and grey shorts. Vilorio

indicated that appellant was the son to whom she had referred.

Sampson asked appellant if he was "Dror Goldberg," and appellant answered affirmatively. Sampson then handcuffed appellant and read him his rights. Sampson explained that a witness to a murder had seen the assailant flee in the Navigator and that he was there to seize the Navigator. Appellant was initially very nervous—almost hyperventilating—but he soon calmed down.

Sampson asked appellant if he had driven the Navigator that day. Appellant answered that he had not, but stated that he had driven his father and Ms. Nelson to the airport in the Navigator the day before. Sampson had appellant feel the hood of the car, and appellant agreed that it had been driven recently. He also gave Sampson a detailed description of his activities of the day. Sampson asked appellant if he would consent to a search of 2202 Dunstan, and appellant agreed.

Sampson unhandcuffed appellant, escorted him back to the police car, and had him sit in the back. He told appellant that he had the right to refuse consent and the right to read the "consent to search" form before signing it. Appellant read the form and signed it. It was witnessed by two other officers at the scene. Although there were several officers present, and all were armed, no weapons were drawn and no one threatened appellant in any way. While still outside with appellant, Sampson noticed a red mark near the center of appellant's chest, near the collarbone. Appellant explained that he must have gotten the injury playing football.

4. Both parties agree that appellant was "seized" at 6:07 p.m. when he was handcuffed upon approaching the residence at 2202 Dunstan. *See State v. Larue*, 28 S.W.3d 549, 553 n. 8 (Tex.Crim.App.2000) (holding both investigative detentions and arrests are seizures). They dispute, however, whether the seizure was a detention or an arrest. *See id.* (stating detentions require reasonable suspicion and arrests require probable cause).

Sampson then escorted appellant into the house. He had appellant wait in the dining room while the house was searched. At some point, appellant indicated that he needed to use the restroom. Sampson escorted appellant to the restroom, and, on the way back to the dining room, Sampson noticed what he believed to be a bloodstain on the back of appellant's shirt. He took the shirt as evidence and had appellant put on another shirt. Sampson also took a Polaroid photograph of appellant while they were in the house. No other evidence was found in the house.

At approximately 7:30 p.m., after searching the Dunstan house, Sampson also asked appellant if he would consent to a search of his apartment at 4301 Bissonnet and his white pick-up truck. Again, Sampson informed appellant that he had the right to refuse consent, and, again, appellant agreed to the search and signed the "consent-to-search forms." Two knives were recovered from appellant's pick-up truck—one an illegal double-edged knife, the other a Swiss army knife. When police searched appellant's apartment, they recovered a pair of dark warm-up pants, with boxer shorts still inside them, and a dark thermal long-sleeved shirt from the floor of appellant's closet.

Sampson secured the Dunstan house at approximately 8:00 p.m., and appellant was taken to the police station at 1200 Travis Street, where he agreed to provide the police with a set of "elimination" finger and palm prints. Appellant was questioned at 1200 Travis by Officer Brian Harris, during which time he agreed to participate in a videotaped line-up. However, to conduct the line-up they had to travel to the old police headquarters at 61 Reisner Street. The fingerprints that appellant had agreed to provide were also to be taken at 61 Reisner. During the drive to 61 Reisner, appellant was not handcuffed and sat in the front seat next to Harris. During the drive, appellant asked whether it would matter that the Navigator had been stolen before. He went on to say that the Navigator had been stolen on several prior occasions, but that it was always simply just returned to the Dunstan address. He theorized that someone must have a duplicate set of keys.

After arriving at 61 Reisner, appellant was given a document entitled "Waiver of Right to Have an Attorney Present at a Show Up." The document informed appellant that the purpose of the line-up was to see if witnesses could identify him as a person who has committed a crime. It also informed appellant that he had the right to have an attorney present at the line-up, or to have one appointed if he could not afford one. Finally, the document stated that appellant made the waiver of his own free will. Appellant signed the document, and then participated in a videotaped line-up. At approximately 11:00 p.m., appellant was released and went home with his mother.

Meanwhile, at approximately 8:30 p.m., Dr. Beckman was shown a photo array containing the Polaroid photograph of appellant, which was taken at the Dunstan residence. Dr. Beckman was 80% certain the man he chose from the photo array, appellant, was the same man he had seen fleeing the wig shop. Both Dr. Beckman and Mrs. Ingrando were later shown the videotaped line-up, and both identified appellant from the line-up as the perpetrator.

*3. Detention or Arrest at 2202 Dunstan?*

█ Appellant contends that he was arrested at 6:07 p.m., when he approached 2202 Dunstan and was handcuffed. The State argues that this was nothing more than an investigative detention.

Whether a detention is an investigative detention or an arrest depends upon the facts and circumstances surrounding the detention. *Amores v. State,* 816 S.W.2d 407, 412 (Tex.Crim.App.1991); *Hoag v. State,* 728 S.W.2d 375, 378–79 (Tex.Crim.App.1987); *Hilla v. State,* 832 S.W.2d 773, 778 (Tex.App.-Houston [1st Dist.] 1992, pet. ref'd). The reasonable use of handcuffs or the ordering of a suspect to lie down alone does not convert an investigative detention into an arrest. Handcuffing alone will not necessarily convert a temporary detention into an arrest. *See Rhodes v. State,* 945 S.W.2d 115, 117 (Tex.Crim.App.1997); *Burkes v. State,* 830 S.W.2d 922, 924 (Tex.Crim.App.1991); *Hilla,* 832 S.W.2d at 778. Whether an officer believes a suspect is detained or arrested, is not determinative of the issue. *Amores,* 816 S.W.2d at 412; *Hoag,* 728 S.W.2d at 378; *Hilla,* 832 S.W.2d at 778. Rather, we look to the reasonableness of the officer's actions, which is to be judged from the perspective of a reasonable officer at the scene, rather than with the advantage of hindsight. *Rhodes,* 945 S.W.2d at 118. "Furthermore, allowances must be made for the fact that officers must often make quick decisions under tense, uncertain and rapidly changing circumstances." *Id.* Police may use such force as is reasonably necessary to effect the goal of the detention: investigation, maintenance of the status quo, or officer safety. *Id.* at 117. An investigative detention implies that the obtrusive act is for the purpose of actually investigating. *Burkes,* 830 S.W.2d at 925. Thus, where no investigation is undertaken, the detention cannot be considered investigatory and rises to the level of an arrest. *Id.*

When Sampson was dispatched to 2202 Dunstan, his assignment was to seize the Navigator and to begin an investigation by questioning the maid. As such, he was clearly conducting an investigation when he was approached by appellant. It was reasonable, in light of the fact that a brutal murder had just occurred, for Sampson to handcuff appellant for the officer's own safety while attempting to ascertain whether appellant had, in fact, been driving the Navigator that day. After appellant was identified as the person who had been in charge of the Navigator, it was reasonable for Sampson to continue to detain him while he, Sampson, completed his investigation of the scene. Although Sampson read appellant his rights, appellant was never told that he was under arrest. Rather, Sampson told appellant that he was investigating how the Navigator came to be seen leaving the scene of a murder. Sampson then continued his investigation by questioning appellant about whether he had driven the Navigator that day.

Therefore, we conclude that the initial handcuffing of appellant was not an arrest, but a temporary detention, and was justified by concerns for the officer's safety. The appellant's continued detention was justified by Sampson's need to continue the investigation he had been dispatched to 2202 Dunstan to perform.

*4. Reasonable Suspicion for Investigatory Detention?*

Having decided that Sampson's initial encounter with appellant at 2202 Dunstan was an investigatory detention, not an arrest, we must next decide whether it was based upon reasonable suspicion. A police officer may stop and briefly detain a person for investigative purposes if the officer, in light of his experience, has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889 (1968). The reasonableness of a temporary detention must be examined in terms of the

totality of the circumstances. *Woods v. State*, 956 S.W.2d 33, 38 (Tex.Crim.App. 1997). A temporary detention is justified when the detaining officer has specific, articulable facts at the time of the detention which, taken together with rational inferences from those facts, lead him to conclude that the person detained is, has been, or soon will be engaged in criminal activity. *Id.* A reasonable suspicion means more than a mere hunch or suspicion. *Davis v. State*, 947 S.W.2d 240, 244 (Tex. Crim.App.1997). A detention is not permissible unless the circumstances objectively support a reasonable suspicion of criminal activity. *Id.*

Officer Sampson testified that he detained appellant because: (1) the Navigator had been seen leaving the scene of the wig shop murder; (2) appellant fit the description of the person witnesses had seen fleeing the wig shop and getting into the Navigator; (3) the maid told Sampson that appellant had been staying at 2202 Dunstan and had been left in charge of the Navigator; and (4) the Navigator was still warm, as if it had been driven recently. Under these circumstances, it was reasonable for Sampson to suspect that appellant was involved in the wig shop murder and to temporarily detain him for further investigation.

### 5. Voluntary Consent to Search?

■ Having decided that the investigatory detention of appellant at 2202 Dunstan was lawful, we next address the issue of whether he voluntarily consented to the searches of 2202 Dunstan, his apartment at 4301 Bissonnet, and his pick-up truck.

■ A search pursuant to voluntary consent is an exception to the requirement that a search be based upon a warrant supported by probable cause. *See Reasor v. State*, 12 S.W.3d 813, 817 (Tex.Crim. App.2000). For consent to be valid, however, it must be voluntary. *Id.* at 817–18. The fact that a defendant is in custody does necessarily mean that his consent was involuntary. *Id.* To determine voluntariness, trial courts "must [assess] the totality of all the surrounding circumstances— both the characteristics of the accused and the details of the interrogation." *Id.* at 818, *quoting Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

In *Reasor*, the defendant was arrested at gunpoint and the police illegally swept his house for weapons. 12 S.W.3d at 815–17. Nevertheless, the court found that his subsequent consent to search was voluntary because appellant twice received his statutory warnings, signed a consent to search form, and was repeatedly warned that he had the right to remain silent. *Id.* at 818. The court concluded that the defendant was aware of his rights, but, nonetheless, voluntarily chose to waive them. *Id.* at 819.

In this case, as we have already determined, appellant was lawfully detained. No weapons were used to effectuate the detention. Appellant was read his rights, and, additionally, Officer Sampson told him three times that he had the right to refuse to consent to any search. Finally, appellant read and signed the consent to search forms. There is nothing to indicate that appellant's "will was overborne" by oppressive police conduct. *See Jackson v. State*, 968 S.W.2d 495, 498 (Tex.App.-Texarkana 1998, pet. ref'd) (*citing Schneckloth*, 412 U.S. at 225–26, 93 S.Ct. 2041). Furthermore, it was not unreasonable for the officers' to continue to detain appellant while they executed the search he had voluntarily given them permission to conduct.

### 6. The Line-up Evidence and Evidence Collected at Police Stations

Although not addressed in a specific point of error, appellant also appears to complain that the videotaped line-up was also a product of his illegal arrest. The State points out that even if appellant was arrested at the time he was transported to the police station, (1) appellant consented to participate in the line-up, and (2) there was probable cause for appellant's arrest. We agree with the State on both arguments.

### a. Consent

■ The evidence shows that appellant was asked whether he would consent to participating in a videotaped line-up, and he answered affirmatively. To conduct the line-up, appellant and Officer Harris had to travel from 1200 Travis to 61 Reisner. During the ride to the Reisner police station, appellant was not handcuffed and sat in the front passenger seat of Harris's car. Appellant read and signed a "Waiver of Right to Have an Attorney Present at a Show Up." In the document, appellant acknowledged the purpose of the line-up, the fact that he knew could have an attorney present, but chose to proceed without counsel, and the fact that his decision to do so was made of his "own free will." Again, there is nothing to indicate that appellant's "will was overborne" by oppressive police conduct. *See Schneckloth,* 412 U.S. at 225, 93 S.Ct. at 2047.

### b. Probable Cause

■ Furthermore, even if we were to assume that appellant's detention became an arrest when he was transported from 2202 Dunstan to 1200 Travis, we would nonetheless find that the arrest was proper based upon article 14.03(a)(1) of the Texas Code of Criminal Procedure, which permits a peace officer to arrest a person without a warrant if the person is found in a suspicious place and under circumstances that reasonably show that such person has

been guilty of some felony or breach of the peace. *See* TEX.CODE CRIM. PROC. ANN. art. 14.03(a)(1) (Vernon Supp.2002).

■ Probable cause exists where the police have reasonably trustworthy information sufficient to warrant a reasonable person to believe a particular person has committed or is committing an offense. *Guzman v. State,* 955 S.W.2d at 87; *Amores v. State,* 816 S.W.2d 407, 413 (Tex. Crim.App.1991). Probable cause deals with probabilities; it requires more than mere suspicion but far less evidence than that needed to support a conviction or even that needed to support a finding by a preponderance of the evidence. *Guzman,* 955 S.W.2d at 87. "The rule of probable cause seeks to accommodate the sometimes opposing interests of safeguarding citizens from rash and unreasonable police conduct and giving fair leeway to legitimate law enforcement efforts." *Id.* Police broadcasts that are based on probable cause and that report a felony and a description of the perpetrator satisfy the requirements for a warrantless arrest. *Law v. State,* 574 S.W.2d 82, 84 (Tex.Crim.App. 1978).

Therefore, we must examine the information that Officer Sampson had gathered by 8:00 p.m.—the time he decided to transport appellant to 1200 Travis for further questioning.

Officer Sampson, in his own words, described his probable cause as follows:

[Defense Counsel]:What justification, what evidence, what factual discoveries did you make justifying the continuing custody of Dror Goldberg and asking one of the uniformed officers to take him down to homicide?

[Officer Sampson]: As we have stated, he matched the general description of the person seen running from the wig shop. The Navigator that was seen at

the location that the person got into was registered to the Dunstan address. Dror Goldberg was left in charge of the house. He did have access to the keys of the Navigator ...

He had an injury that I saw on his chest that was consistent in appearance to what I had been told about some activity that took place inside the wig shop where the murder took place. His accounting of his day did not actively or accurately—let me retract—restate that. His accounting of his day did not account for 4:00 p.m. at the approximate time that the offense was supposed to have taken place. I used that to base my decision to have him taken to the Homicide Division to give a statement.

Although not mentioned by Officer Sampson in this passage of testimony, Sampson had also discovered that appellant had blood on his shirt. Although the blood turned out to be appellant's own blood, Sampson could not have known that at the time. Also not mentioned by Officer Sampson, but present in the record, was evidence that appellant became extremely nervous—almost hyperventilating—when he was informed of the reason for the police investigation.

In light of the facts that: (1) appellant matched the description given by witnesses at the scene of the crime; (2) the Navigator that was seen fleeing the crime was left in appellant's care and control, appellant had access to the vehicle, and the vehicle was still warm; (3) appellant could not offer a clear alibi for the time of the offense; (4) appellant had a wound to his chest that was consistent with information that a struggle had occurred at the wig shop; (5) appellant had what appeared to be blood on his shirt; and (6) appellant almost hyperventilated when he was told the purpose of the officer's visit, we conclude that Officer Sampson had sufficient

cause to believe that appellant was involved in the wig shop murder.

### c. "Suspicious Place"

■■■■■ To justify a warrantless arrest under article 14.03(a)(1), the State must prove not only the existence of probable cause, but also that the defendant was found in a "suspicious place." Very few places are suspicious per se. *Johnson v. State,* 722 S.W.2d 417, 421 (Tex.Crim.App. 1986.) A place may become "suspicious," however, based on the surrounding circumstances. *Id.* The facts available to the arresting officer at the time, and reasonable inferences drawn from those facts, may render a place suspicious so as to invoke article 14.03(a)(1). *Muniz v. State,* 851 S.W.2d 238, 251 (Tex.Crim.App.1993); *Johnson,* 722 S.W.2d at 421. A place can be suspicious because: (1) an eyewitness or police officer connected the place to the crime; (2) a crime occurred there or the police reasonably believed a crime occurred there; (3) specific evidence directly connected the defendant or the place with the crime; or (4) appellant's behavior was a factor in determining whether a place was suspicious. *See State v. Parson,* 988 S.W.2d 264, 268–69 (Tex.App.-San Antonio 1998, no pet.).

In this case, appellant was found at 2202 Dunstan in his father's yard. Although not an inherently suspicious place, the presence of the Navigator at 2202 Dunstan connected the defendant to the crime scene, because an eyewitness saw the same Navigator at the crime scene and appellant had access to the Navigator. Therefore, the presence of the Navigator rendered 2202 Dunstan a suspicious place.

Even if we agree that appellant's detention became a full blown arrest when he was transported downtown for further questioning, we conclude it was a valid arrest pursuant to article 14.03(a)(1) be-

cause it was based upon probable cause and appellant was found in a suspicious place. Therefore, evidence collected at 1200 Travis and 61 Reisner, including the line-ups, were not the fruit of an illegal arrest.

Accordingly, we overrule points of error one through nine.

*7. Reasonable Expectation of Privacy in Exterior of Navigator?*

■ In point of error 10, appellant contends the trial court erred by considering the fact that the hood of the Navigator was warm when touched by police. Specifically, appellant argues that he had a reasonable expectation of privacy, which the police violated by approaching the vehicle and touching it.

We disagree. The record shows that the Navigator was parked in a driveway, covered by an open carport, behind the residence. The carport consisted of metal poles supporting a canvas-type awning, which provided shade for vehicles parked beneath, but did not shield them from public view.

The carport was accessed from a public alley that ran behind the house. The Dunstan address was on the corner of the block, and the Navigator was visible from both the public alley and the adjoining street. In fact, the Navigator was parked no more than a few feet from Shepherd Street and the adjacent sidewalk and was also within a few feet from the public alley. To the left of the Navigator was a hedge of bushes, which partially separated the carport from the street. However, there was no privacy fence. The rear entrance of the house was clearly visible through the open carport.

*a. No Search*

In *Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974), the defendant was arrested and his car was seized from a public parking lot and impounded. 417 U.S. at 588–89, 94 S.Ct. at 2468. At that point, the police had probable cause to believe the vehicle had been used in a crime. 417 U.S. at 587–88, 94 S.Ct. at 2467. However, the next day, without first obtaining a warrant, the police examined the tire treads and took paint scrapings from the car. 417 U.S. at 589, 94 S.Ct. at 2468. The Supreme Court, in a plurality opinion, held that the physical examination of the exterior of the car was not a search. 417 U.S. at 592–93, 94 S.Ct. at 2470.

> [N]othing from the interior of the car and no personal effects, which the Fourth Amendment traditionally has been deemed to protect, were searched or seized and introduced into evidence. With the "search" limited to the examination of the tire on the wheel and the taking of paint scrapings from the exterior of the vehicle left in the public parking lot, we fail to comprehend what expectation of privacy was infringed. Stated simply, the invasion of privacy, "if it can be said to exist, is abstract and theoretical." Under circumstances such as these, where probable cause exists, a warrantless examination of the exterior of a car is not unreasonable under the Fourth and Fourteenth Amendments.

*Id.* (citations omitted).

In *Hudson v. State,* 588 S.W.2d 348, 350–52 (Tex.Crim.App.1979), the Texas Court of Criminal Appeals, following *Cardwell,* also held that the examination of the exterior of a vehicle was not a search, even if the examination took place on private property. In *Hudson,* the defendant was arrested in his home, while his car, which was parked next to his home, was photographed, both inside and out. The Court of Criminal Appeals concluded that the photographs of the exterior of the car were

admissible because the defendant had no reasonable expectation of privacy in the exterior of his car. *Id.* at 352. Therefore, taking photographs of the exterior of the car was not a search. *Id.* at 351, 352. The court found it unimportant that the police were on private property when the photographs were taken. *See id.* at 352.

It is true that the car was taken from a public parking lot in *Cardwell,* but that was not the basis of the [Supreme] Court's decision. The gravamen of the holding was that the owner of the car had no reasonable expectation that the exterior of his car would not be examined.

*Id.* (footnote omitted).

In this case, the police, while standing on a public street or in a public alley, were able to identify the license plate of the Navigator as the same number that Dr. Beckman had written down at the murder scene. At that point, they had probable cause to believe that the Navigator had been used in the crime. Touching the hood of the vehicle, like the taking the photographs in *Hudson* or the paint scrapings in *Cardwell,* was not a search, but was simply a physical examination of the exterior of the vehicle.

### b. probable cause plus exigency

 However, even if we were to conclude that the touching of the Navigator was a search, it would nonetheless be permissible because the exigency of the situation made the procurement of a warrant impracticable. To justify a warrantless search, the State must show the existence of probable cause at the time the search was made, and the existence of exigent circumstances, which made the procuring of a warrant impracticable. *McNairy v. State,* 835 S.W.2d 101, 106 (Tex.Crim.App.1991); *Hooper v. State,* 516 S.W.2d 941, 943 (Tex.Crim.App.1974).

As we stated above, the police had probable cause to search the vehicle once they determined that the license plate and description of the vehicle matched that provided by Dr. Beckman at the scene of the crime. *See Blount v. State,* 965 S.W.2d 53, 55 (Tex.App.-Houston [1st Dist.] 1998, pet. ref'd) (holding that police broadcast describing alleged crime committed, the color of defendant's car, and defendant's license plate number established probable cause).

Obtaining a warrant before touching the vehicle to see if it had been recently driven would have been impracticable, because, obviously, the heat emanating from the engine would have dissipated while the officers were waiting for the warrant. Therefore, based on the existence of probable cause plus exigency, we conclude that the officers were justified in touching the vehicle without first obtaining a warrant.

Furthermore, the intrusion by the police by walking into the open carport and touching the vehicle was so slight, that the privacy interest appellant seeks to protect is not one we believe that society would deem reasonable. *See Katz v. United States,* 389 U.S. 347, 351–53, 88 S.Ct. 507, 511–12, 19 L.Ed.2d 576 (1967) (holding that fourth amendment protects people in places where they have a subjective expectation of privacy that is objectively reasonable).

Finally, even if we were to disregard the fact that the hood of the car was warm, our disposition of the preceding points of error would remain unchanged.

For these reasons, we overrule point of error 10.

### B. Relevancy of Knives and Clothing

#### 1. The Knives.

 When the police searched appellant's pick-up truck they recovered two knives—one a Swiss army knife and one a

large, double-edged knife. In points of error 11–13, appellant contends the trial court erred by admitting the knives because they were either (1) irrelevant, or (2) the probative value of the knives was substantially outweighed by the risk of undue prejudice. The State argues that the alleged error was not preserved because appellant did not object every time the State presented evidence about the knives.

We believe that the error was preserved because the trial court heard appellant's relevancy objection outside the presence of the jury and ruled that the evidence of the knives would be admitted. "When the court hears objections to offered evidence out of the presence of the jury and rules that such evidence be admitted, such objections shall be deemed to apply to such evidence when it is admitted before the jury without the necessity of repeating those objections." Tex.R. Evid. 103(a)(1); see Ethington v. State, 819 S.W.2d 854, 858 (Tex.Crim.App.1991).

### a. Relevant?

Thus, we must decide whether the trial court abused its discretion in ruling that the evidence regarding the knives was relevant and not unduly prejudicial. We review a trial court's decision to admit or exclude evidence for abuse of discretion. Green v. State, 934 S.W.2d 92, 101–02 (Tex.Crim.App.1996). Where the trial court's evidentiary ruling is within the "zone of reasonable disagreement," there is no abuse of discretion, and the reviewing court will uphold the trial court's ruling. Id. The exclusion of evidence does not result in reversible error unless it affects a substantial right of the accused. See Tex. R.App. P. 44.2(b). Substantial rights are affected when the error has a substantial and injurious effect or influence in determining the jury's verdict. King v. State, 953 S.W.2d 266, 271 (Tex.Crim.App.1997).

Evidence is relevant if it tends to make the existence of any consequential fact more or less probable than it is without the evidence. Tex.R. Evid. 401; Rankin v. State, 974 S.W.2d 707, 719 (Tex.Crim.App. 1998) (op. on reh'g). Appellant argues that the knives that were recovered from the truck are irrelevant because the State did not theorize that either of the knives was the murder weapon. Appellant points out that the coroner was of the opinion that the victim's wounds were caused by a single-edged knife, but that the large knife recovered from appellant's truck was a double-edged knife. Appellant also points out that, in her closing argument, the prosecutor argued that it was likely that appellant disposed of the actual murder weapon.

We do not agree that appellant's possession of the double-edged knife was irrelevant. The coroner testified that he was 75% certain that a single-edged knife was used in the attack. That, of course, leaves a 25% chance that a double-edged knife was used. The victim was killed with a knife, and a knife was recovered from appellant's truck. There is no conclusive proof that the knife recovered from the truck could not have been the murder weapon. It was within the province of the jury to decide whether or not the knife recovered from the truck was the knife used by appellant. As such, the double-edged knife was relevant. The Swiss army knife we will address in our harmless error analysis below.

### b. Unduly Prejudicial?

Having decided that at least one of the knives was relevant, we must now decide whether the risk of unfair prejudice substantially outweighed the probative value. Texas Rule of Evidence 403 favors the admission of relevant evidence, and it presumes that relevant evidence will be more probative than prejudicial. Verbois v. State, 909 S.W.2d 140, 142 (Tex.

App.-Houston [14th Dist.] 1995, no pet.). The burden is on the party opposing admissibility to demonstrate that the negative attributes of the admitted evidence substantially outweigh its probative value. *Id.* The trial court's decision to admit the evidence should be overturned only on an abuse of discretion, i.e., only when it is outside the zone of reasonable disagreement. *Id.*

In this case, the risk of undue prejudice was that the jury would convict appellant based on the fact that he carried an illegal knife. However, the prosecutor never mentioned to the jury that the double-edged knife that was recovered from appellant's truck was, in fact, illegal. Furthermore, the second knife recovered was a Swiss Army knife, and was clearly not illegal. It is hard to see how the jury would be unfairly prejudiced against appellant simply because two apparently legal knives were recovered from his truck. Accordingly, we hold that the admission of the knives did not violate Rule 403.

### c. Harmless Error?

 Even if we were to agree that the knives were irrelevant, we would nonetheless conclude that the admission of the knives was harmless error.[5] The record shows that the State did not emphasize the knives in presenting their case. Less than 5 pages of a 35 volume reporter's record mention recovery of the knives. The prosecutor did not mention the knives during her closing argument at all. Although the double-edged knife was illegal, the State, by not mentioning that fact to the jury,

lessened any chance that the jury would convict appellant simply because he was a bad person who carried illegal knives. Although the jury asked to see the knife recovered from appellant's truck during deliberations, it is unlikely that it placed undue weight on the knife in deciding whether to convict, especially in light of the State's argument that the killer probably disposed of the murder weapon. Similarly, we find it hard to imagine that the jury would place undue weight on the fact that the police recovered an innocuous Swiss army knife, because such knives are not illegal and are commonly carried by law-abiding citizens everyday. Therefore, even if we had found the knives irrelevant, which we did not, we would nonetheless conclude that their admission did not affect a substantial right of the accused.

Accordingly, we overrule points of error 11, 12, and 13.

### 2. The Clothes

 When the police searched appellant's apartment, they recovered a pair of dark warm-up pants with boxer shorts still inside them and a dark thermal long-sleeved shirt from the floor of appellant's closet. These clothes, generally, matched the description of the clothes the murderer was wearing. In points of error 14–16, appellant contends the trial court erred by admitting the clothes because they were either (1) irrelevant, or (2) the probative value of the clothes was substantially outweighed by the risk of undue prejudice. The State argues that the alleged error was not preserved because appellant did

---

5. We will not reverse a criminal conviction for non-constitutional error if, after examining the record as a whole, we conclude with fair assurance that the error did not influence the jury, or influenced the jury only slightly. *Schutz v. State,* 63 S.W.3d 442, 444 (Tex. Crim.App.2001). This means that we should consider everything in the record, including testimony and physical evidence, the nature of the evidence supporting the verdict, and the character of the error and its relationship to other evidence. *Id.* Additionally, we may consider the trial court's instructions to the jury, the theories of the case that the State and defendant have espoused, arguments to the jury, and relevant voir dire. *Id.*

not object every time the State presented evidence about the clothes.

In this instance, we agree with the State. There was no objection to the clothes that was heard and ruled on outside the presence of the jury, as there was with the knives. Therefore, appellant cannot rely on Rule of Evidence 103(a)(1) to preserve error. To preserve error for appeal, appellant was required to make a timely, specific objection at the earliest possible opportunity. *See Penry v. State,* 903 S.W.2d 715, 763 (Tex.Crim.App.1995); *Turner v. State,* 805 S.W.2d 423, 431 (Tex. Crim.App.1991).

Officer Sampson testified, without objection, that when he searched appellant's apartment, he recovered clothes that were similar in appearance to those worn by the man seen fleeing the scene of the murder. He also identified State's exhibits 225, 226, and 227 as the clothes that he recovered from appellant's apartment. The prosecutor, however, did not move to introduce the clothes during Sampson's testimony. Instead, the clothes were introduced through a later witness, Officer Alfredo Mares, a member of HPD's Crime Scene Unit Division, who actually took possession of the clothes at the scene of the search. Mares testified that exhibits 225, 226, and 227 were, in fact, the same clothes that he recovered from appellant's apartment. The prosecutor then moved to introduce the clothes, and appellant's counsel, for the first time, objected that the evidence of the clothes was irrelevant.

Appellant's objection came too late because both Sampson and Mares had already testified about the clothes, and the clothes had already been shown to the jury. *See Thompson v. State,* 691 S.W.2d 627, 635 (Tex.Crim.App.1984) (stating timely objection must be made as soon as ground of objection becomes apparent).

Accordingly, we overrule points of error 14, 15, and 16.

## C. Admission of Journal Confiscated at School in 1995 and Letters from 1996

In points of error 17–26, appellant contends the trial court erred by denying his motion to suppress evidence that was recovered as a result of a school search that occurred in 1995, three years before the murder. A brief recitation of the pertinent facts is appropriate.

### 1. Background

On April 10, 1995, appellant threw a beer can out of his car window as he drove into the Bellaire High School parking lot at 10:30 in the morning. The can almost hit Houston Independent School District (HISD) Officer Duggan, who, along with HISD Officer–in–Training Griest, approached appellant and asked if he had been drinking. Appellant told Duggan that he had been drinking, and that he had some beer left over from a party the night before. He volunteered to show the officers the beer in his trunk. Before beginning the search appellant's of trunk, Duggan radioed Bellaire Police Officer Bartlett for help. The police found the beer in a cooler in appellant's trunk and told appellant that, if he would pour it out, he would not be charged as being a minor in possession of alcohol. Appellant poured out the beer. The officers, with appellant's consent, searched appellant's car and found three marihuana cigarettes in the ashtray. The police also discovered a small novelty knife on appellant's keychain, which was illegal because it was double-edged.

Appellant was taken to the assistant principal's office and his parents were notified. At the principal's office, appellant's backpack was searched to see if it contained any other weapons or contraband. During the search, Officer Griest opened a

spiral notebook to look for drugs. She testified that they sometimes find smashed marihuana, cocaine, and LSD in books. As she flipped through the pages of the notebook, Officer Griest noticed a drawing of the devil with blood "all over it and blood everywhere and it was just—it was striking." On the very next page was a title "How to Kill a Woman." Officer Griest testified about what was written under that title as follows:

[Griest]: I remember that I read thoughts. It wasn't a poem, it wasn't a letter and it took you from beginning to end. It took you—talked about abducting. Talked about using a knife to make several cuts so that when she bled, the body would be covered, I mean, in red. Talked about her begging for her life. You could feel it. I mean, it was disturbing. Talked about her begging for her life and then the joy when she looked into his eyes and he realized they were dead and that he had no use for the bitch.

[The prosecutor]: Do you remember the notebook saying anything about words that he used?

[Griest]: Yes.

[The prosecutor]: What?

[Griest]: Say things to her, Do you like it? Want me to do it some more? I'm going to do this. Just really talking. It was very talkative to the victim while she was being stabbed. Very tormenting. [The notebook described] how she would sweat, how her eyes would look, just the terror. You could—it was like reading the best novel you've ever read in your life.

The notebook also contained a title "How to Rape a Woman," which Griest described as follows:

Talking about during penetration putting hands around her neck and her begging him stop, her begging him till

she couldn't beg anymore because her air flow was getting cut off and getting erect when he let go right before her body—right before, I guess, he said lifeless and she would gasp for air and sexually turn him on.

\* \* \* \*

There were several references. I mean, talked about urge to kill, talked about having the—you know, the urge be [sic] so strong that he didn't think he could fight it anymore. It was getting harder and harder. Contemplating suicide.

Griest testified that she asked appellant why he would write such "sick shit" and he replied, "I have thoughts." Appellant was then released into the custody of his parents and the notebook was turned over to them. Appellant was charged with possession of an illegal weapon and placed on juvenile probation.

*2. Reading Notebook an Illegal Search?*

■ Appellant contends that reading the notebook was an illegal search under the article 18.02(10) of the Texas Code of Criminal Procedure, which provides:

A search warrant may be issued to search for and seize:

(10) property or items, except the personal writings by the accused, constituting evidence of an offense or constituting evidence tending to show that a particular person committed an offense[.]

TEX.CODE CRIM. PROC. ANN. art. 18.02(10) (Vernon Supp.2002).

■ However, no search warrant was issued in this case, thus, article 18.02(10) is not applicable. *See Morton v. State,* 761 S.W.2d 876, 879 (Tex.App.-Austin 1988, pet. ref'd). Furthermore, we note that no search warrant is needed to perform a school search of a student who is under the

school's authority. *See New Jersey v. T.L.O.,* 469 U.S. 325, 340, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985).

■■■■ To determine whether a school search is reasonable we must first determine whether the search was justified at its inception. *Coronado v. State,* 835 S.W.2d 636, 640 (Tex.Crim.App.1992) (*citing T.L.O.,* 469 U.S. at 341, 105 S.Ct. at 742–43). A search is justified at its inception when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated, or is violating, either the law or the rules of the school. *Id.* Second, we must determine whether the search, as actually conducted, was reasonably related in scope to the circumstances that justified the initial interference. *Id.* A search is permissible in scope when the measures adopted and used are reasonably related to the objectives of the search and are not excessively intrusive in light of the age and sex of the student and the nature of the infraction. *Id.*

### a. Justified at Inception?

■■■■ In this case, the HISD officers were justified in detaining and searching appellant and his vehicle because Officer Duggan saw appellant throw a beer can out his car window. This was evidence that both the law and school rules had been violated. The further detention and search of appellant's backpack were likewise justified because marihuana cigarettes were found in appellant's ashtray, and it was reasonable for the officers to attempt to determine whether appellant was carrying marihuana onto school premises. Officer Griest testified that she was flipping through appellant's notebook because students often hid drugs in their books. Therefore, we conclude that the search of appellant's notebook was justified at its inception because the officers had a reasonable ground for suspecting

that appellant was violating the law and school rules by carrying marihuana.

### b. Excessive in Scope?

■■■ Appellant argues that, even if the HISD officers were justified in searching his backpack, they exceeded the necessary scope of the search by reading the notebook. Again, we disagree. In determining that a warrant requirement was unnecessary for school searches, the Supreme Court recognized "[t]he special need for an immediate response to behavior that threatens either the safety of schoolchildren and teachers or the educational process itself . . ." *T.L.O.,* 469 U.S. 325, 353, 105 S.Ct. 733, 749, 83 L.Ed.2d 720. As we have learned from unfortunate events such as the school shootings at Columbine High School in Littleton, Colorado, school officials must take seriously perceived threats to the safety and well-being of their students and faculty.

As we stated earlier, Officer Griest was conducting a reasonable search for drugs in appellant's notebook when she noticed a picture of a demon dripping blood and the title "How to Kill a Woman." We believe that the officer then had the right, if not the responsibility, to read the passage in the notebook to determine whether it constituted an immediate threat to a student or teacher at Bellaire High School.

We do not agree with appellant's assertion that private writings are always beyond the scope of a permissible school search. In fact, in *T.L.O.,* the United States Supreme Court held that it was permissible for a school administrator to read letters found in a student's purse, which implicated her in drug-dealing. 469 U.S. at 347, 105 S.Ct. at 746.

Accordingly, we hold that appellant's notebook was seized and read pursuant to a valid school search. There was no viola-

tion of Texas law or the Fourth Amendment.

### 3. Violation of Privilege Against Self-Incrimination?

■ Appellant, citing *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), argues that admitting the notebook violated his Fifth Amendment right against self-incrimination. In *Boyd*, the Supreme Court held that a subpoena duces tecum ordering the defendant to produce an invoice that established his guilt for non-payment of taxes was unconstitutional under the Fourth and Fifth Amendments. The Court noted that it was "unable to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially different from compelling him to be a witness against himself." 116 U.S. at 633, 6 S.Ct. at 534. The Court further stated that "a compulsory production of the private books and papers of the [defendant] . . . is compelling him to be a witness against himself, within the meaning of the Fifth Amendment to the Constitution . . ." 116 U.S. at 634–35, 6 S.Ct. at 534–35.

However, in the 1970's, the Supreme Court began to retreat from the "broad statements" of *Boyd. See Andresen v. Maryland*, 427 U.S. 463, 472, 96 S.Ct. 2737, 2744, 49 L.Ed.2d 627 (1976) (noting, "the continued validity of the broad statements contained in [*Boyd* and earlier cases] has been discredited by later opinions.").

In *Fisher v. United States*, 425 U.S. 391, 408, 96 S.Ct. 1569, 1579–80, 48 L.Ed.2d 39 (1976), the defendants, relying on *Boyd*, argued that the Fifth Amendment privilege against self-incrimination protected them from complying with IRS summonses requiring them to produce personal tax records prepared by the defendant's accountants. The Court noted that the "Fifth Amendment does not independently proscribe the compelled production of every sort of incriminating evidence but only applies when the accused is compelled to make a testimonial communication that is incriminating." 425 U.S. at 408, 96 S.Ct. at 1579. Because the preparation of the papers sought was "wholly voluntary," the Court concluded that it was not "compelled testimonial evidence." 425 U.S. at 409–410, 96 S.Ct. at 1580. The Court also noted that there was no general Fifth Amendment right to privacy.

> Within the limits imposed by the language of the Fifth Amendment, which we necessarily observe, the privilege truly serves privacy interests; but the Court has never on any ground, personal privacy included, applied the Fifth Amendment to prevent the otherwise proper acquisition or use of evidence, which in the Court's view, did not involve compelled testimonial self-incrimination of some sort.
>
> \* \* \* \*
>
> We cannot cut the Fifth Amendment completely loose from the moorings of its language, and make it serve as a general protector of privacy—a word not mentioned in its text and a concept directly addressed in the Fourth Amendment. We adhere to the view that the Fifth Amendment protects against "compelled self-incrimination, not [the disclosure of] private information."

425 U.S. at 399–401, 96 S.Ct. at 1575–76.

In *Andresen v. Maryland*, the police seized personal business records of the defendant that they discovered while performing a search pursuant to a search warrant. 427 U.S. at 466, 96 S.Ct. at 2741. The defendant argued that the introduction of the documents into evidence violated his Fifth Amendment privilege against self-incrimination. 427 U.S. at 469, 96 S.Ct. at 2743. The Supreme Court disagreed, and, in doing so, elaborated on what

the term "compelled self-incrimination" meant.

> [P]etitioner was not asked to say or do anything. The records seized contained statements that petitioner had voluntarily committed to writing. The search for and seizure of these records were conducted by law enforcement personnel. Finally, when these records were introduced at trial, they were authenticated by a handwriting expert, not by petitioner. Any compulsion of petitioner to speak, other than the inherent psychological pressure to respond at trial to unfavorable evidence, was not present. This case thus falls within the principle stated by Mr. Justice Holmes: "A party is privileged from producing the evidence but not from its production." *Johnson v. United States,* 228 U.S. 457, 458, 33 S.Ct. 572, 57 L.Ed. 919 (1913). This principle recognizes that the protection afforded by the Self–Incrimination Clause of the Fifth Amendment "adheres basically to the person, not to information that may incriminate him." *Couch v. United States,* 409 U.S. [322] at 328, 93 S.Ct. [611] at 616 [34 L.Ed.2d 548 (1973)]. Thus, although the Fifth Amendment may protect an individual from complying with a subpoena for the production of his personal records in his possession because the very act of production may constitute a compulsory authentication of incriminating information, a seizure of the same materials by law enforcement officers differs in a crucial respect[,] the individual against whom the search is directed is not required to aid in the discovery, production, or authentication of incriminating evidence.

427 U.S. at 473–74, 96 S.Ct. at 2745. The Supreme Court concluded that, "because the statements seized were voluntarily committed to paper before police arrived to search for them" appellant was not compelled to give evidence against himself. 427 U.S. at 477, 96 S.Ct. at 2746–47.

Finally, in *United States v. Doe,* 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984), the Court again concluded that, because the personal documents at issue in the case were prepared voluntarily, they " 'cannot be said to contain compelled testimonial evidence' in and of themselves." 465 U.S. at 612 n. 9, 104 S.Ct. at 1242 n. 9. Even though the documents at issue in *Doe* were personal business records, the Court, without limitation stated, "If the party asserting the Fifth Amendment privilege has voluntarily compiled the document, no compulsion is present and the contents of the document are not privileged." 465 U.S. at 612 n. 10, 104 S.Ct. at 1242 n. 10.

At least four federal courts of appeals have concluded that the Fifth Amendment does not protect documents, business or personal, that were voluntarily prepared. *See In re Grand Jury Subpoena Duces Tecum Dated October 29, 1992,* 1 F.3d 87, 93 (2nd Cir.1993) (holding calendar prepared by grand jury target not protected by Fifth Amendment privilege); *United States v. Wujkowski,* 929 F.2d 981, 983 (4th Cir.1991) (holding appointment books and records relating to vacation home not protected by Fifth Amendment privilege); *In re Sealed Case,* 877 F.2d 83, 84 (D.C.Cir.1989) (holding privilege does not cover contents of any voluntarily prepared records, whether personal or business); *In re Grand Jury Proceedings on Feb. 4, 1982,* 759 F.2d 1418, 1419 (9th Cir.1985) (holding contents of business and personal documents not privileged unless created under compulsion).

This interpretation is supported by Justice O'Connor's concurring opinion in *United States v. Doe,* wherein she writes:

I write separately ... just to make explicit what is implicit in the analysis of [the Court's] opinion: that *the Fifth Amendment provides absolutely no protection for the contents of private papers of any kind.* The notion that the Fifth Amendment protects the privacy of papers originated in *Boyd v. United States,* but our decision in *Fisher v. United States,* sounded the death knell for *Boyd.* "Several of *Boyd's* express or implicit declarations [had] not stood the test of time," and its privacy of papers concept "ha[d] long been a rule searching for a rationale ..." Today's decision puts a long overdue end to that fruitless search.

465 U.S. at 618, 104 S.Ct. at 1245 (citations omitted) (emphasis added). As the Second Circuit has stated, "The [Supreme] Court no longer views the Fifth Amendment as a general protector of privacy or private information, but leaves that role to the Fourth Amendment." *In re Grand Jury Subpoena Duces Tecum Dated October 29, 1992,* 1 F.3d at 93.

 Applying the rationale of *Fisher, Andresen,* and *Doe,* we hold that the admission of appellant's notebook into evidence does not violate his Fifth Amendment privilege against self-incrimination. The notebook was discovered by HISD officials during a search that we have already held met the reasonableness requirement of the Fourth Amendment. Appellant was under no compulsion to produce the notebook—it was seized during a lawful search. Additionally, appellant voluntarily created the notebook and the drawings and essays contained therein. Again, there was no compulsion by the

State. The Fifth Amendment generally provides no further protection for private papers than that provided by the Fourth Amendment [6], which we have already held was not violated.

### 4. Violation of Right to Privacy and Free Expression

 Appellant also argues that even if his Fifth Amendment rights were not violated by the admission of the notebook, his First Amendment right to privacy and free expression was violated. Appellant argues that "[i]f the First Amendment means anything, it means that the state has no business telling a man what to think." We agree that the State cannot criminalize thoughts. *See Texas v. Johnson,* 491 U.S. 397, 414, 109 S.Ct. 2533, 2544, 105 L.Ed.2d 342 (1989) ("[T]he government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"). However, in this case, appellant was not on trial for having murderous thoughts—he was on trial for acting on those murderous thoughts. As such, he was prosecuted for his actions, not his thoughts.

 However, the First Amendment also prevents a state from using evidence of a defendant's abstract beliefs against him at trial, *unless* those beliefs have a bearing on the issues in the case. *See Dawson v. Delaware,* 503 U.S. 159, 167–68, 112 S.Ct. 1093, 1098–99, 117 L.Ed.2d 309 (1992) (holding defendant's association with white racist prison gang inadmissible at punishment phase because not related to relevant issue in case).

---

**6.** The Fifth Amendment, however, may protect a defendant from the responsibility of *producing* incriminating documents, even if prepared voluntarily, if: (1) the existence and location of the subpoenaed papers are unknown to the government; or (2) where production of the papers by the defendant would implicitly authenticate the documents. *See In re Grand Jury Subpoena Duces Tecum Dated October 29, 1992,* 1 F.3d at 93. Neither situation is present in this case; thus, we decline to address this issue.

Therefore, the issue is not whether appellant's notebook was protected First Amendment speech, but whether it was relevant to an issue in the case.[7] Thus, we turn to appellant's argument that his notebook, which was written three years before the crime, was irrelevant.

### 5. Relevancy of Appellant's Notebook and Letters to his Friend

#### a. Background

In 1995, three years before the offense, appellant wrote the essay "How to Kill a Woman," which we have described above. In 1996, two years before the offense, appellant wrote letters to his friend, Josh Vogel, in which he stated that he wanted to kill Josh's girlfriend by "popping her head like a zit." Appellant also told Josh that he wanted to kill his own girlfriend by cutting her throat. Appellant told Josh, "I'm changing into a violent young man and I like it."

At trial, appellant argued that the notebook and the letters to Vogel were irrelevant and/or unfairly prejudicial.

#### b. Relevancy

■ As we stated earlier, evidence is relevant if it tends to make the existence of any consequential fact more or less probable than it is without the evidence.

TEX.R. EVID. 401; *Rankin,* 974 S.W.2d at 719–20. The State argues that the evidence was relevant to show motive, intent, and identity. We agree.

The main issue in this case was whether the eyewitnesses had correctly identified appellant as the man they saw running from the wig shop after the murder. Appellant presented substantial evidence attempting to cast doubt on the reliability of the eyewitness testimony. However, appellant's notebook tended to corroborate the eyewitness testimony because in it, appellant used very similar words to describe how he would kill a woman as the assailant used when he attacked Mrs. Ingrando.[8] Therefore, the similarity between appellant's fantasy, as revealed in his notebook, and the actual event as it occurred, make it more likely that appellant was, in fact, the murderer. Therefore, the notebook was relevant to the issue of identity.

■ The notebook and the letters were both relevant to the issue of motive. In this crime, there was no obvious motive. There was no robbery and no personal animosity between appellant and his victims. However, the diary and the letters to Vogel presented the only plausible evidence of why appellant, an apparently av-

---

7. We note that *Dawson* involved the issue of whether the defendant's First Amendment freedom of association was violated by admitting evidence *at punishment* that he was a member of a prison gang. *See* 503 U.S. at 168–69, 112 S.Ct. at 1099. However, we believe that the reasoning of *Dawson* is equally applicable at the *guilt/innocence* stage of trial, i.e., speech protected by the First Amendment may be admitted against a defendant at the guilt/innocence stage of trial *if* the speech is relevant to issues presented at guilt/innocence. *See Wisconsin v. Mitchell,* 508 U.S. 476, 488, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993) ("The First Amendment, moreover, does not prohibit the evidentiary use of speech *to* establish the elements of a crime or to prove motive or intent. Evidence

of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like.").

8. In the notebook appellant wrote that he would make lots of small cuts on the victim so the blood would cover her body. He also wrote that he would ask the victim, "Do you like it? Do you feel pretty? You're very pretty. Does it feel good?" Mrs. Ingrando testified that during the attack, the murderer whispered, "You like it? You—I'm going to make you pretty." He then sliced down her nose and stabbed her in the throat, before continuing to cut her a total of 14 times.

erage teen-ager from an affluent family, would commit such a heinous and random murder. The diary and letters showed that appellant had written about his murderous fantasies, thus providing evidence of motive, i.e., the fulfillment of his fantasies by acting on them several years later.

In *Paschal v. State*, 35 S.W.3d 80, 81–82 (Tex.App.-Texarkana 2000, no pet.), the State introduced four notes that the defendant had written to his girlfriend. In the notes, the defendant expressed hatred, disgust, and a desire of vengeance against the victim. *Id.* at 82. The court held that the notes were relevant to provide a motive for committing aggravated assault. *Id.*

Accordingly, we hold that the notebook and letters were admissible to show identity and motive.

#### c. Unfair Prejudice

▮▮▮▮ Appellant also argues that the admission of the notebook violated Tex.R. Evid. 403 because its probative value was substantially outweighed by the danger of unfair prejudice. Even if evidence is relevant, the trial court may nevertheless exclude it if the court determines that the probative value of the extraneous act evidence is substantially outweighed by unfair prejudice. TEX.R. EVID. 403. When the trial court balances probativeness and prejudice, a presumption exists favoring probative value. *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex.Crim.App.1990). As long as the trial judge "operates within the boundaries of [his or her] discretion," in performing such a balancing test, an appellate court should not disturb the decision, whatever it may be. *Id.* at 390.

A Rule 403 balancing test by the trial court includes the following considerations:

1. how compellingly the extraneous evidence serves to make a fact of consequence more or less probable—a factor which is related to the strength of the evidence presented by the proponent to show the defendant in fact committed the extraneous offense;

2. the potential the other evidence has to impress the jury "in some irrational but nevertheless indelible way;"

3. the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense;

4. the force of the proponent's need for this evidence to prove a fact of consequence, i.e., does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute.

*See Wyatt v. State*, 23 S.W.3d 18, 26 (Tex. Crim.App.2000).

In this case, the evidence of the notebook and letters was compelling evidence of motive and identity because the language used in the writings was strikingly similar to . that used by the murderer. However, the evidence, as the State concedes, was very prejudicial because it exposed appellant's murderous fantasies to the jury. The evidence was also fairly time-consuming because the State had to bring in an HISD officer to testify about the 1995 school search. But, finally, we note that the State's need for the evidence in this case was extremely great to establish both identity and motive. Although there were several eyewitnesses that identified appellant as the murderer, these witnesses's credibility was vigorously attacked on cross-examination. In fact, the defense brought an expert witness to testify about the fallibility of eyewitness testimony. Therefore, the State needed to admit appellant's very similar writings to show that he was, in fact, the person that committed the crime. Likewise, without the evidence from the notebook and letters, the State would have had no evidence

to explain why a seemingly normal teenager would commit such a senseless crime.

### d. Remoteness

■ Finally, appellant argues that the notebooks and letters were irrelevant because they were too remote to have any probative value. Appellant cites *United States v. Beechum*, 582 F.2d 898, 915 (5th Cir.1978), which held that the temporal remoteness of an extraneous offense decreases the probity of the extraneous offense evidence. We begin by noting that the notebook and letters were not extraneous offenses. *See Moreno v. State*, 858 S.W.2d 453, 463 (Tex.Crim.App.1993) (stating inchoate thoughts do not amount to extraneous acts). Furthermore, we do not agree with appellant that the evidence at issue lost all relevance simply because of the passage of time. Accordingly, we conclude that the trial court did not err by determining that the risk of unfair prejudice did not substantially outweigh the probative value of the notebook and letters.

### 6. Violation of Family Code?

■ Appellant also argues that the trial court erred by admitting appellant's personal writings because they were obtained in violation of Tex. Fam.Code Ann. § 52.02 (Vernon Supp.2002), which provides:

(a) Except as provided by Subsection (c), a person taking a child into custody, without unnecessary delay and without first taking the child to any place other than a juvenile processing office designated under Section 52.025, shall do one of the following:

(1) release the child to a parent, guardian, custodian of the child, or other responsible adult upon that person's promise to bring the child before the juvenile court as requested by the court[.]

*Id.* Based on the record before us, we conclude that the State complied with section 52.02(a) by immediately calling appellant's parents, and then releasing him to their custody.

### 7. Conclusion Regarding Admission of 1995 Notebook and 1996 Letters

Because we have overruled all issues that appellant has presented on the admission of the notebook and the letters, we overrule points of error 17–29 and 33–35.

## D. Admission of the Novelty Knife from Appellant's Keychain

■ When appellant was searched in 1995 on the Bellaire High School Campus, police discovered a small, double-edged knife on his keychain. Appellant contends the trial court erred by admitting evidence of the knife, which he contends was irrelevant and unfairly prejudicial. The State contends that appellant "opened the door" to the admission of the evidence. We follow the usual standard of review. *See Green v. State*, 934 S.W.2d at 101–02.

At trial, the defense called Dr. Richard Austin, a clinical psychologist, to testify for appellant. Dr. Austin testified that he had treated appellant in 1995 after the incident at Bellaire High School. He was asked on direct examination: "Were you told about some notebook that he had with him when he had the problem at Bellaire?" Dr. Austin responded, "Yes." He went on to conclude that appellant had shown improvement and needed no further psychological treatment.

The prosecutor then argued to the trial court that by questioning Dr. Austin about the notebook, appellant had created the impression that Dr. Austin was familiar with the notebook and the circumstances of the 1995 incident, and that the State was entitled to go into more detail to de-

termine the extent of Dr. Austin's knowledge.

[the prosecutor]: It's the State's position with this witness the defense has opened the door to the other page in the diary about how to rape a woman and all of the things that were in the notebook. He's come in here to testify about the fact he seemed fine and normal, didn't need any more psychotherapy and we have the right to ask him about what all he knew.

[defense counsel]: I don't think the door's been opened at all. In fact, the questioning about it is from the State. The State brought out at first that Dr. Austin had been seeing or had seen him and what we've brought out, yes, he'd seen him. He was told—they asked about [appellant's mother] when she told him about the diary, he couldn't remember whether he did or not learn about the diary, but the diary didn't exist. He says he hasn't seen it up to now. For the State to go through what they've claimed is not proper.

[the court]: I agree with the State the door has been opened. The implication that he knew some things about a diary and he's not the one that saw the notebook, I think the implication to the jury is this man drew things about him and he gave him a passing bill and by the witness' own statement, there are some things that were written in that diary, and I agree with the State. I think they have the right to explore what this man knew when he gave them the passing grade of being absolutely find and that he did not need follow-up. I'm going to allow it.

[defense counsel]: There's another issue. In his notes there's also reference to dagger, there's also reference to being on probation and seeing a probation

officer. We haven't opened any door to either of those. I object to it.

[the court]: I've never known anything about probation and I don't think there's any relevance about whether or not he was on probation, but if he's giving him—if he's talking about violence with women or violence in general, I think that the State has the right to explore him possessing a dagger as well. I think the door's been opened as well by the implication of the defense questions going into that but not into the fact about anything about a [probation].

* * * *

The knife at the time of the Bellaire incident, not that it is an illegal weapon, but the fact that he did have a knife at that point, I think that goes into his diagnosis whether he knew about that. He just testified that he gives this guy a clean bill of health and the State has a right to find out what he knew.

Thereafter, Dr. Austin acknowledged that appellant had a dagger with him when he was stopped on the Bellaire High School campus. He also testified that he would have found it alarming if he had known that appellant's diary included a passage about using a knife to kill a woman.

By testifying that, in his expert opinion, appellant required no further psychological treatment, we agree that Dr. Austin "opened the door" for the State to challenge the basis of that knowledge by asking whether Dr. Austin what he knew about the facts of appellant's 1995 incident at Bellaire High School. Evidence that appellant was carrying a dagger on campus when he was stopped, and that his diary detailed killing a woman with a knife, was relevant because it tended to affect the weight the jury would give to Dr. Austin's expert opinion. By presenting Dr. Austin's testimony, appellant created

an issue of whether or not he required further psychological counseling after the 1995 incident at Bellaire High School. As such, the circumstances of the incident, including the contents of the diary and the fact that appellant was carrying a knife, were relevant. Accordingly, we overrule points of error 30–32.

## E. The Line–Up Procedures

■ In points of error 36–41, appellant contends the trial court erred by permitting Dr. Beckman and Mrs. Ingrando to identify appellant as the murderer before the jury after both had viewed an impermissibly suggestive pre-trial line-up. To determine the admissibility of an in-court identification that is challenged by a defendant we follow a two-step analysis. First, we consider whether the pretrial identification procedure was impermissibly suggestive. *Barley v. State,* 906 S.W.2d 27, 33 (Tex.Crim.App.1995). Second, if the procedure was impermissibly suggestive, we determine whether the procedure created a very substantial likelihood of irreparable misidentification. *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); *Barley,* 906 S.W.2d at 33. It is this second prong that directly implicates a defendant's due process rights. *Simmons,* 390 U.S. at 381, 88 S Ct. at 970. It is the defendant's burden to prove these two elements by clear and convincing evidence. *Barley,* 906 S.W.2d at 34. If the defendant is able to do so, the in-court identification is inadmissible, unless the State can prove by clear and convincing evidence that the identification was of "independent origin." *United States v. Wade,* 388 U.S. 218, 240–41, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149 (1967); *Williams v. State,* 477 S.W.2d 885, 889 (Tex.Crim.App.1972).

We will discuss each witness's identification separately to determine whether the pretrial procedures used were impermissibly suggestive.

### 1. Dr. Beckman

#### a. The photospread

■ Approximately four and one-half hours after the murder, Dr. Beckman was asked to view a photospread to see if he could identify the man he had seen running from the wig shop. Appellant's photograph was number three in the photospread. Dr. Beckman said that number three looked like the person he saw, but he couldn't be sure. The police then asked Beckman how sure he was on a scale of one to 10, and Beckman responded "eight."

Appellant contends the photospread was "suggestive on its face," but does not explain how it was suggestive. We have reviewed the photospread and do not find it "suggestive on its face." The photospread includes six photographs, of equally poor quality, of young men with light blond to dark brown hair. All of the photographs are the same size and shape and taken from approximately the same perspective, and the photograph of appellant is not distinctive in any manner.

■ Appellant also contends that the photospread should be suppressed because the police tainted the procedure by asking Beckman to assign a percentage of certainty to his tentative identification of appellant. We disagree. While the police did attempt to quantify Beckman's level of certainty, they did not suggest what percentage would be appropriate.

Accordingly, we conclude that the trial court did not abuse its discretion by permitting the evidence that Dr. Beckman had identified appellant from the photospread.

#### b. The Videotaped Line-up

■ Approximately one week after the murder, the police met with Dr. Beckman

at his house and had him view a video-taped line-up. Appellant was in the fifth position in the videotaped line-up. Again, Dr. Beckman indicated that he was 80% sure that the person he saw running from the wig shop was the person in the fifth position on the videotaped line-up.

Appellant contends that the videotaped line-up was impermissibly suggestive because he was the only person that appeared in both the photospread and the videotaped line-up.

In *Cantu v. State,* 738 S.W.2d 249 (Tex. Crim.App.1987), the court acknowledged that showing a witness several photographic displays on different occasions, each containing a photograph of a defendant, when the witness has not previously identified the defendant, is a suggestive procedure. *Id.* at 251–52. "Such procedure tends to highlight a particular defendant since the witness sees the same face repeatedly. Such reoccurrence of one particular face might suggest to the witness that the police think the defendant is the culprit." *Id.* at 252. However, the court further noted that "[n]ot every case in which several arrays or displays of a defendant containing *different* pictures of a defendant are suggestive." *Id.* (emphasis added). "It may be necessary to show a witness different pictures because a defendant may have several 'different looks', i.e., different ages, clean shaven and bearded looks. Suggestiveness must be determined by the circumstances of each case." *Id.* The court concluded that the procedure used in *Cantu* was suggestive because two of the three photographic line-ups contained the same picture of the defendant and there was no evidence about how the photograph in the third line-up was any different from the other two. *Id.*

We believe that *Cantu* is distinguishable because, in this case, the police did not show the same or similar photograph of appellant in both line-ups. The first identification was made based on the photographic line-up. The second line-up clearly presented a different image of appellant because it was not simply a "head shot" photograph of appellant, but a live action, albeit videotaped, image of appellant walking through the line-up procedure. Therefore, we conclude that, under the facts of this case, showing Dr. Beckman two line-ups, each containing appellant's image, was not a suggestive procedure because the images presented of appellant were sufficiently different. *See Benitez v. State,* 5 S.W.3d 915, 922 (Tex.App.-Amarillo 1999, pet. ref'd) (holding that multiple line-ups containing different images of defendant not suggestive procedure).

Because the line-up procedures were not suggestive, the trial court did not err by permitting Dr. Beckman to identify appellant at trial. Accordingly, we overrule points of error 36–38.

### 2. Mrs. Ingrando

Mrs. Ingrando was not able to view the photographic line-up on the day of the offense because she was in the hospital. However, she was released from the hospital on December 7, 1998, and, a few days later, the police showed her the same videotaped line-up they had shown Dr. Beckman. An audiotape was made of the proceeding, and the transcript of that audiotape contains the following:

[Mrs. Ingrando]: Ok then uh, well it would be the (inaudible) one

[police officer]: The fifth one

[Mrs. Ingrando]: It kinda, it kinda scare me.

\* \* \* \*

[police officer]: OK, alright. Number, number five is the one you identified. Is that what you are saying?

[Mrs. Ingrando]: The one that scared me the most

[police officer]: OK

[Mrs. Ingrando]: I feel like it

[police officer]: Like he's the one that did it. How sure are you? On a scale of one through then (sic), I asked you this earlier. On a scale of one throught (sic) ten, one being weak and ten being strong.

[Mrs. Ingrando]: OK, I would say probably eighty

[police officer]: Eighty percent?

[Mrs. Ingrando]: Yes

\* \* \* \*

[Mrs. Ingrando]: [Number 5 is] the one I feel very strongly about

[police officer]: OK, very strongly. OK

[Mrs. Ingrando]: Yeah

\* \* \* \*

[police officer]: OK. And do you wanna file charges on this man?

[Mrs. Ingrando]: Oh yes, of course

[police officer]: OK

[Mrs. Ingrando]: I wanna try to find out if its really him, yes

Appellant again argues that they police "extracted an artificial 80% degree of certainty" from Mrs. Ingrando, when all she had said was that appellant "scared her." As we stated with Dr. Beckman, there is nothing suggestive in requesting the witness to attempt to quantify his or her degree of certainty. We do not agree that Mrs. Ingrando's statement that she wanted to "find out if it's really him" indicated that the police, not Mrs. Ingrando, had identified appellant. Mrs. Ingrando had just stated that she was only 80% certain in her identification—her desire to see appellant in person "to find out if it's really

him" is not inconsistent with her somewhat tentative identification of him from the videotaped line-up.

Because we find nothing suggestive in the videotaped line-up procedures employed in Mrs. Ingrando's pretrial identification of appellant, we hold that the trial court did not err by allowing Mrs. Ingrando to identify appellant at trial.

Accordingly, we overrule points of error 39–41.

### F. Admission of Post–Indictment Statements Made to German Police

In points of error 42–46, appellant contends the trial court erred by denying his motion to suppress all post-indictment statements that appellant made to German police when he was arrested. Specifically, appellant argues that admission of the statements violated: (1) his Sixth Amendment right to counsel because he was under indictment at the time and; (2) article 38.22 of the Texas Code of Criminal Procedure because the statements were not recorded.

#### 1. Facts

Appellant was indicted on February 17, 1999, but Houston police were not able to arrest him immediately because he had left the country. Instead, the police obtained a federal warrant, which was relayed to the State Department, who passed the information on to Interpol.

On June 21, 1999, appellant was traveling from Bangkok to Mexico City. His flight had a layover in Frankfurt Germany. During the layover, appellant left the transit area of the airport to get a drink or newspaper, so he had to present his passport.[9] When he did so, the German police discovered the outstanding warrant.

---

9. Had appellant remained in the transit area, which connects international flight to international flight, he would not have had to present

Officer Thorsten Raupach of the Border Police Department testified that he told appellant he was under arrest because of a murder warrant. Appellant replied that he knew about the arrest warrant. Officer Raupach asked appellant how he knew, and appellant said that his father had told him on the telephone. When filling out the arrest report, appellant responded that he was a student and had been traveling in Bangkok, and was going to visit Mexico City. Officer Raupach asked appellant where he was going after Mexico City, and appellant replied, "Miami." However, appellant had no tickets for any travel beyond Mexico City.

Officer Raupach asked appellant if he knew why the police were looking for him. Appellant responded that a woman had been hit by a car and that some witnesses saw the license plate, which was registered to his mother. He said that, because his mother was at work, the police thought it must have been him driving the car.

Officer Raupach searched appellant's backpack and found a bag of pills. When he asked appellant what the pills were for, appellant responded that they were for epilepsy. The officer then took appellant to a clinic so that he could take his medicine. Appellant explained to the doctor in the clinic that the medicine was for epilepsy.

When Officer Raupach told appellant that if he had not left the transit area he would not have had to show his passport, appellant asked Raupach what the German word for "stupid" was. Officer Raupach also told appellant that he was entitled to make one phone call to someone in Germany. Appellant called the American Consulate and spoke to a Mrs. Plate, while Officer Raupach waited nearby. Appellant repeated the story about a car acci-

*his passport because he would never have*

dent, and then asked the Consulate to call his father and his attorney.

After Officer Raupach learned the details of the offense for which appellant was arrested, he asked appellant about it and appellant said, "No, no, I wasn't there."

Thus, the statements at issue are:

1. Appellant's statement that he knew he was wanted for murder.

2. Appellant's statement that his father had told him on the telephone that he was wanted for murder in the United States.

3. Appellant's statement that he was wanted because someone ran over a woman in his mother's car and the police thought he was the driver.

4. Appellant's statement that he needed the pills in his backpack for epilepsy.

5. Appellant's statement that after he visited Mexico City he intended to proceed to Miami.

## 2. No Custodial Interrogation

 We begin by noting that statement no. 1 was not made in response to custodial interrogation. When Officer Raupach told appellant he was wanted for murder, appellant volunteered that he knew. Thus, statement no. 1 was volunteered; it was not a response to custodial interrogation.

We also note that, even though Raupach asked appellant why he was wanted for murder, and appellant responded with the story about the car accident, appellant voluntarily repeated the same story to Mrs. Plate at the American Consulate. Appellant's statements to Mrs. Plate, which were made in Officer Raupach's presence, were made volunteered and, thus, were not the product of any questioning. There-

*officially entered Germany.*

fore, the substance of statement no. 3 was admissible.

Finally, we note that appellant told the doctor at the airport clinic that he needed the pills from his backpack for epilepsy. This statement was not in response to any questioning; thus, statement no. 4 was not the product of custodial interrogation.

Therefore, in our analysis of appellant's points of error we address only statements no. 2 & 5, i.e., that appellant knew he was wanted for murder because his father told him on the telephone, and that appellant planned to travel to Miami after he visited Mexico City.

*3. Sixth Amendment*

Appellant concedes that Officer Raupach had no duty under the Fifth or Fourteenth Amendment to provide *Miranda* warnings to appellant before appellant's statements could be offered against him at trial in Texas. *See Alvarado v. State*, 853 S.W.2d 17, 21, (Tex.Crim.App.1993). However, appellant argues that the *Alvarado* opinion does not address the issue of his Sixth Amendment right to counsel after indictment.

The State acknowledges that *Alvarado* deals only with the Fifth and Fourteenth Amendments, but argues that its reasoning is equally applicable to appellant's claims under the Sixth Amendment. We agree.

In *Alvarado*, the defendant, a United States citizen, shot and killed a man in El Paso and then fled to Juarez, Mexico. 853 S.W.2d at 19. The El Paso police notified the authorities in Juarez that appellant was a suspect for a murder committed in the United States and was believed to be in Juarez. *Id.* The Mexican police apprehended the defendant, and following the Mexican Code of Criminal Procedure, obtained a written statement from the defendant in which he confessed to the murder.

*Id.* At trial, appellant moved to suppress his confession, arguing that the Mexican police violated his rights under the Fifth and Fourteen Amendments. *Id.* at 19–20.

The Court of Criminal Appeals held that "*Miranda* warnings are not essential to the validity of a confession which has been obtained in a foreign country by foreign officials." *Id.* at 20–21.

The rationale for such a rule was explained in *Kilday v. United States*, "the United States Constitution cannot compel such specific, affirmative action by foreign sovereigns, [such as requiring the *Miranda* warnings,] so the policy of deterring so-called "third degree" police tactics, which underlies the *Miranda* exclusionary rule, is inapposite to [cases where a suspect is interrogated by foreign authorities]."

* * * *

The clear import of *Miranda* is to require U.S. officials to notify accused persons of their constitutionally protected rights prior to any questioning. This prophylactic measure, protects *our* citizens from our state and *our* federal governmental actions. We know of no constitutional objective that would be served by extending *Miranda* to cases outside our borders.

*Id., quoting Kilday v. United States*, 481 F.2d 655, 656 (5th Cir.1973) (emphasis added).

 Just as *Miranda* and the Fifth Amendment protect U.S. citizens from *our* government's actions, so does the Sixth Amendment. Therefore, we agree that the general rule is that the questioning by foreign police, of a citizen under indictment in the United States, without the presence of an attorney, does not violate the Sixth Amendment.

*a. "Shocks the Conscience" Exception*

■ However, as the *Alvarado* court explained, there are two exceptions to the general rule. First, a confession made to foreign police will be excluded, even if lawful in the foreign jurisdiction, if the circumstances of the confession "shocks [sic] the conscience of an American Court." *Id.* at 21–22. Nothing about the questioning in this case "shocks the conscience." In fact, appellant himself commented to both the German police and the American Consulate about how well he was treated in Germany.

b. *"Agent of the State" Exception*

■ A second exception to the general rule of admissibility of confessions made to foreign police is "when U.S. law enforcement personnel participate in the foreign interrogation or if the foreign authorities are acting as agents for their U.S. counterparts." *Id.* at 22. The burden is on appellant, as the party asserting the existence of such an agency, to prove it. *Id.* at 22–23. We review the trial court's implied finding of "no agency relationship" for an abuse of discretion. *See id.* at 23.

In *Alvarado,* the court found that no agency relationship existed between the United States and Mexico. In so holding, the court noted that American officials did not participate in taking the confession, and that "mere notification of the potential existence of a criminal in another police's jurisdiction is not enough to create such a relationship." *Id.* at 23–24.

> Texas border officials consistently notify their Mexican counterparts when a fugitive crosses the border. We view this as good police practice, rather than evidence that establishes a joint venture relationship. If this alone were to create a joint venture relationship, our sister states' police officers would become agents of our State's law enforcement personnel simply because we notified them of the movement of a fugitive.

> This is clearly not the intended result, not do we so conclude.

*Id.* at 24.

In this case, we cannot say that the trial court abused its discretion by concluding that appellant had failed to prove the existence of an agency relationship between Texas and German police. The record shows only that appellant was arrested because German police, via Interpol, discovered that there was a federal warrant out for appellant's arrest. As such, the record shows only that German police were made aware of the presence of a criminal within their borders. There was no indication that Texas police requested, or even tacitly approved of the questioning of appellant by German police. As such, it cannot be said that German police were acting for Texas police at the time of the questioning.

Because the questioning was not by an "agent of the state of Texas," the admission of appellant's statements to the German police does not violate the Sixth Amendment. *See State v. Hernandez,* 842 S.W.2d 306, 317–18 (Tex.App.-San Antonio 1992, pet. ref'd) (holding that post-indictment questioning by reporter did not violate Sixth Amendment because reporter was not state agent).

c. *Code of Criminal Procedure Article 38.22*

i. *Error?*

■ Appellant also contends that the questioning by the German police violated article 38.22 of the Code of Criminal Procedure because it was not electronically recorded. Article 38.22 provides in part:

> No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:

an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement.

TEX.CODE CRIM. PROC. ANN. art. 38.22, § 3(a)(1) (Vernon Supp.2002). The Court of Criminal Appeals has held that, unlike *Miranda* and the Fifth Amendment [and presumably the Sixth Amendment also], article 38.22 is a procedural evidentiary rule, and that, because the law of the forum applies to procedural rules, a statement taken in a foreign jurisdiction must nonetheless comply with article 38.22 or it will not be admissible in Texas. *See Davidson v. State,* 25 S.W.3d 183, 186 (Tex.Crim.App.2000). In *Davidson,* the court held that an unrecorded statement taken by a United States Customs Agent in Montana was inadmissible because it violated article 38.22, even though the statement complied fully with the laws of Montana. *Id.* at 185–86.

Bound as we are to follow *Davidson,* we conclude that the statements appellant made to the German police are inadmissible in Texas because they were not electronically recorded as required by article 38.22. Thus, we turn to the issue of harm.

*ii. Harm?*

 Because article 38.22 is a statutory violation, and not of constitutional magnitude, we must disregard the error unless it affected "substantial rights" of the appellant. TEX.R.APP. P. 44.2(b). As we stated above, appellant repeated most of the statements he made to Officer Raupach to either the German doctor at the airport or the American Consulate. The statements to those parties were not made in response to custodial interrogation. Thus, the admission of the same information through Officer Raupach was harmless error.

 Furthermore, admission of the remaining statements—that appellant knew he was wanted for murder because his father told him on the telephone and that appellant planned to travel to Miami after leaving Mexico—did not affect "substantial rights" of appellant. Appellant had already volunteered information to Officer Raupach that he knew he was wanted for murder. Further questioning by Officer Raupach only elicited *how* appellant knew that fact, i.e., that his father had told him on the telephone. The information that appellant was planning to travel to Miami after leaving Mexico was hardly any more damning than the evidence, properly admitted, that he did not have tickets to travel to Houston, even though there were direct flights from Frankfurt to Houston daily, and appellant knew he was under indictment in Houston. Neither of the statements touched on the key issue in the case of whether appellant had been properly identified as the murderer. As such, we conclude that admitting the statements appellant made to the German Police did not have "a substantial and injurious effect or influence in determining the jury's verdict." *King v. State,* 953 S.W.2d 266, 271 (Tex.Crim.App.1997).

Accordingly, we overrule points of error 42–46.

## G. *Batson* Issue—Exclusion of Women From the Jury

 In points of error 47–49, appellant contends the trial court erred by permitting the State to use its peremptory strikes to exclude women from the jury. In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court held the State's use of racially discriminatory peremptory challenges violated the Equal Protection Clause. The rationale and holding of *Batson* has been extended to gender. *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 145, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994); *Fritz v. State,* 946

S.W.2d 844, 847 (Tex.Crim.App.1997). Trial courts follow a three-step process when confronted with a *Batson* challenge. First, the defendant must make a prima facie showing that the strike was made on an impermissible basis (e.g., race or sex). If a prima facie case is made, the burden of production shifts to the State to provide a neutral reason for the strike. If a neutral explanation is proffered, the defendant must prove purposeful discrimination. *Purkett v. Elem,* 514 U.S. 765, 767–78, 115 S.Ct. 1769, 1770–71, 131 L.Ed.2d 834 (1995); *Ladd v. State,* 3 S.W.3d 547, 563 (Tex.Crim.App.1999). Appellate courts review the trial court's ruling on a *Batson* motion under the clearly erroneous standard of review. *See Pondexter v. State,* 942 S.W.2d 577, 581 (Tex.Crim.App.1996). To hold the trial court's decision was clearly erroneous, the appellate court must be left with a "definite and firm conviction that a mistake has been committed." *Vargas v. State,* 838 S.W.2d 552, 554 (Tex. Crim.App.1992).

*1. Facts*

During voir dire, the following exchange took place:

[defense counsel]: We move to quash the jury panel because of a violation of the rule on Batson and they're allowed challenges made certainly on the basis of racial relations. Juror No. 8 struck by the—struck based on the person's Jewish religion. The defendant is Jewish ans so is his family.

[the court]: That's it?

[defense counsel]: Yes.

[the court]: I do not find based on that sufficient reason for the State to say any reason why they struck that person, but in an abundance of caution, I would like [the prosecutor] to state your reason for striking no. 8.

[defense counsel]: 18, no. 8.

[the prosecutor]: Judge, I'm not sure why he's articulated the reasons he has. Best answer I can give the Court, I like men better than women. I struck more women than men, period. There were certain women who I felt I related to better than others. There was some women [defense counsel] related better to. [Defense counsel], I think [prospective juror 8] liked him. I got the feeling through the questionnaire and listening to her talk she is someone who would be very outspoken once she took a position. She would never change her mind. There are several ladies on the panel we struck for just that reason, as a matter of fact, no. 3, as [defense counsel] agreed, for the same reason. I think that literally once she took a position, she would never give in and that's why [defense counsel] agreed to her. [Prospective juror 8] was the same thing. There are several women on the panel, just like the nurse who is on it, I struck white female Protestant. I think once she made up her mind, she wouldn't change. It's the bow up factor, if they're going to bow up, they're going to bow up forever. I think that's [prospective juror 8].

[the court]: I want to make sure it's clear. I did find the defense did [not] make a proper prima facie case; however, I did ask for that reason for protection of the record.

No further objections were made by the appellant.

*2. Analysis*

 Appellant's *Batson* objection at trial was that the prosecutor was using her peremptory strikes to remove Jewish people from the jury. However, on appeal, he complains that the prosecutor was using her peremptory strikes to remove women from the jury. He never made that complaint at trial. Because his point of error

on appeal does not comport with his objection at trial, his complaints on appeal have been waived. *See Coffey v. State,* 796 S.W.2d 175, 179 (Tex.Crim.App.1990) (trial court objection must comport with point of error raised on appeal).

Accordingly, we overrule points of error 47–49.

## H. Rule of Optional Completeness

■ In point of error 50, appellant contends the trial court erred by refusing to allow him to question the investigating police officer about statements the defendant made to the officer. Appellant contends that, because the State was allowed to present a portion of appellant's statement to police, he should have been allowed to introduce the remainder of the conversation under Rule 107 of the Texas Rules of Evidence.

Rule 107 provides:

When part of an act, declaration, conversation, writing or recorded statement is given in evidence by one party, the whole on the same subject may be inquired into by the other, and any other act, declaration, writing or recorded statement which is necessary to make it fully understood or to explain the same may also be given in evidence . . .

TEX.R. EVID. 107.

During the direct examination of Officer Sampson, the following exchange took place:

[the prosecutor]: Turning your attention now to November 30, 1998, what did you spend that day doing in regards to this case?

[Officer Sampson]: *During the conversation that I had with [appellant] at Dunstan, I asked him his activities of the day* and he told me he had been playing football just prior to arriving back at the Dunstan address. And dur-

ing that conversation he gave me—I asked him to give me a list of the names of the people he was playing football with and as many telephone numbers that he could remember or knew. (Emphasis added).

[the prosecutor] Did he give you all the information?

[Officer Sampson]: As much as he could, yes.

Thereafter, appellant sought "to elicit everything that [a]ppellant told Officer Sampson about 'his activities of the day,' but the judge only permitted [a]ppellant to inquire about playing football." Specifically, the trial court stated:

My ruling here is that you can get into—specifically into the portion of the conversation concerning defendant's naming football players and it's necessary to make that portion fully understood because it doesn't make it necessary and I will let you go into those portions of the conversation of the football players at the time that he arrived at the football field. At the time he arrived and if it makes it clear, I will let it in.

Appellant contends that, under rule 107, he should have been permitted to get everything that he told Officer Sampson about his activities of the day into evidence. We disagree.

■■ Rule 107 is properly invoked when an opposing party reads part, but not all, of a statement into evidence. *See Livingston v. State,* 739 S.W.2d 311, 331–32 (Tex.Crim.App.1987); *Araiza v. State,* 929 S.W.2d 552, 555–56 (Tex.App.-San Antonio 1996, pet. ref'd). In such a case, the remainder of the statement "on the same subject" is admissible to "reduce the possibility of the fact finder receiving a false impression. . . ." *Roman v. State,* 503 S.W.2d 252, 253 (Tex.Crim.App.1974);

*Araiza,* 929 S.W.2d at 556. However, merely referring to a statement or a quotation from it does not invoke the rule. *Jernigan v. State,* 589 S.W.2d 681, 694–95 (Tex.Crim.App.1979); *Pinkney v. State,* 848 S.W.2d 363, 367 (Tex.App.-Houston [1st Dist.] 1993, no pet.); *Araiza,* 929 S.W.2d at 556.

In this case, Officer Sampson did not offer extensive details about his conversation with appellant about "[appellant's] actions that day." Rather, Officer Sampson testified that, because appellant told him that he had been playing football just before he was detained, Sampson spent the next day interviewing the football players appellant had named. The trial court, properly, allowed appellant to question Sampson about the same subject, i.e., Sampson's conversation with appellant regarding the football game. It did not, however, allow appellant to present his entire version of the events of the day of the murder. Such evidence would have been self-serving hearsay by appellant and was not necessary to correct a false, or incorrect impression created by Officer Sampson's testimony. *See Jones v. State,* 963 S.W.2d 177, 182 (Tex.App.-Fort Worth 1998, pet. ref'd) (stating rule 107 permits self-serving hearsay statements by defendant only when necessary to correct false impression created by hearing only part of statement).

Accordingly, we overrule point of error 50.

## I. Comment on Appellant's Decision Not to Testify

In point of error 51, appellant contends the trial court erred by overruling his objection to the State's closing argument, which, he contends, constituted a comment on appellant's decision not to testify. The State responds that the comment at issue was, in actuality, an appropriate response to the argument of the appellant's trial counsel. The State further argues that the trial court's instruction to the jury to disregard the comment cured any possible error.

### 1. Background

During the trial, defense counsel repeatedly attempted to offer into evidence oral and written statements that appellant made to police officers while he was in custody on November 27, 1998. The State objected to the admission of the statements each time they were offered, arguing that they were self-serving hearsay. During final arguments to the jury at the end of the guilt/innocence stage of trial, appellant's counsel commented about the State's unwillingness to allow the statements in evidence. Specifically, the defense argued:

"[Appellant] gets to the police station at 8:20. He, again, is interviewed. He, again, answers all the questions that they have of him. He, again, gives them the time line of where he has been that day. Not only does he give them an oral statement, he gives them a written statement. It's not in evidence, but the State objected. It's very unusual when a suspect gives a written statement for the State to object. But it's not in evidence. But we do know that he gave a written statement, and we do know that the officer set out to check it out. And if there was anyone in the written statement that was wrong, they would have brought you evidence: but everything that they checked out, checked out."

During the prosecutor's final argument to the jury, she made the following statement, referring to the defense attorney's final argument:

[defense counsel] says: The State objects to me trying to get out of Sampson

what the defendant's activities were that day. Then he says—The State objects to me trying to get in the defendant's written statement, and that's rare around here that that happens.

You know what? Directly in response to his comment is this: Do you think that I can cross-examine from Sampson what the defendant told him? No. Strategic reasons keep us from letting things in because we're trying to make the trial end up the way we want it to end up, for strategic reasons. We didn't want his story coming in without him telling the story.

Appellant's counsel objected and the trial court sustained the objection. He then moved for a mistrial, which the trial court denied.

### 2. Standard of Review

 Permissible jury argument falls within one of four categories: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) pleas for law enforcement; and (4) response to opposing counsel. *Felder v. State*, 848 S.W.2d 85, 94–95 (Tex.Crim.App.1992). If we determine that the argument fell outside these four categories, we must then determine whether, in light of the record as a whole, there is a reasonable probability that the improper argument might have contributed to appellant's conviction or punishment. *Orona v. State*, 791 S.W.2d 125, 128 (Tex.Crim.App.1990). Even if the argument exceeds the bounds of proper jury argument, reversible error occurs only when, in light of the record as a whole, the argument is extreme, manifestly improper, violative of a mandatory statute, or injects new facts harmful to the accused into the trial proceeding. *Simpson v. State*, 886 S.W.2d 449, 454 (Tex.App.-Houston [1st Dist.] 1994, pet. ref'd).

### 3. Response to Argument by Defense

 Appellant argues that the State's argument was an improper comment of his failure to take the stand, which violated his right against self-incrimination. The State responds that the comment was a response to the arguments of appellant's counsel, who repeatedly implied that the State was hiding evidence favorable to appellant by objecting to the admissibility of appellant's written statement.

We hold that the prosecutor's comment, "we didn't want his story coming in without him telling the story" was a response to defense counsel's argument that the State was hiding evidence by objecting to the admission of appellant's statement. As such, it was permissible under *Long v. State*, 823 S.W.2d 259, 269 (Tex.Crim.App. 1991), which holds that, even if it requires the prosecutor to comment on a defendant's failure to testify, the State may answer jury arguments made by the defense. Here, the State mentioned the defendant's failure to testify in the context of responding to defense counsel. There was no way for the prosecutor to explain to the jury why she had objected to the admission of the written statement without bringing attention to defendant's refusal to testify.

Accordingly, we overrule point of error 51.

We affirm the judgment.