Opinion Issued January 13, 2005



















In The
Court of Appeals
For The
First District of Texas




NO. 01-03-01226-CR
____________

MELODY SHENAE HARRIS, Appellant

V.

THE STATE OF TEXAS, Appellee



 
On Appeal from the 337th District Court
Harris County, Texas
Trial Court Cause No. 934330




MEMORANDUM OPINION
          A jury found appellant, Melody Shenae Harris, guilty of the offense of murder



and assessed her punishment at confinement for 14 years. In three points of error,
appellant contends that the trial court erred in admitting into evidence a letter written
by appellant to her ex-boyfriend and that the evidence was legally and factually
insufficient to support her conviction. We affirm.
Facts Krystle Brown testified that, on December 22, 2002, she met appellant and
Kelli Parker at a grocery store at about 5:00 p.m. to prepare for a barbecue to be held
at the Seville Apartments, where a friend, Samuel “Dee” Jones, lived. After they
arrived at Jones’s apartment, appellant, Parker, Brown, and Michael Stout went to a
Wal-Mart store. Brown explained that, although Jones and appellant were then
seeing each other and had been for “some months,” appellant was pregnant with
Stout’s child and had previously dated Stout for a year. 
          After leaving the store, Brown dropped Stout off, and the three girls returned
to Jones’s apartment. Shortly thereafter, Tamika Delane, the complainant, who also
“used to go” with Stout, and Stout’s mother, Vel Stout, stopped by Jones’s apartment. 
Vel Stout spoke with appellant and Brown about their spreading a rumor that Vel had
AIDS. After Vel Stout and the complainant left, appellant, in her car, drove Brown
and Parker to Vel Stout’s house to explain that appellant had not spread the rumor. 
As they approached the house, they saw Kendrich Hines driving a car, which also
contained Stout, the complainant, and Nekitha “Nicole” Fields, Stout’s sister, away
from the house. 
          Brown further testified that, when they saw each other, appellant and Stout left
their respective cars, confronted each other, and argued. After returning to their cars,
appellant, wanting to speak with Vel Stout, again left her car and approached Vel
Stout’s door. Stout then left Hines’s car and followed appellant. The complainant
followed Stout, approached appellant, said, “I been wanting to whip that ho for a long
time,” and hit appellant, pushing her to the ground. After appellant and the
complainant had fought for a few minutes, everyone returned to their cars to leave. 
However, appellant, again wanting to speak with Vel Stout, went inside the house,
returning to her car a few minutes later. 
          Appellant then drove Brown and Parker toward the Seville Apartments, where
they had originally planned to have the barbecue. Brown explained that the brakes
on appellant’s car had been functioning properly throughout the day and that the
weather was dry. Brown stated that, on the way back to the apartments, appellant said
that she “couldn’t believe how [Stout] let that whore beat his baby mama like that.” 
When they turned onto the street leading to the apartments, they saw the complainant
and Fields standing on the edge of the street “between the grass and the pavement.” 
When appellant turned the corner, “she was going slow, then she picked up speed”
and drove toward the complainant. Brown explained that the complainant and Fields
were approximately 15 feet away from appellant’s car when Brown first saw them,
that appellant was looking directly toward the complainant and Fields after she turned
the corner, and that, as the car approached the complainant and Fields, Fields ran off. 
Brown testified that “[w]e turned the corner and [appellant] sped up and went towards
[the complainant] and hit her.” Appellant’s car dragged the complainant’s body “a
little ways.” After the car stopped, Stout dragged appellant out of the car, and Brown
and Parker then went to call for emergency assistance. 
          Kelli Parker also testified that, after leaving Vel Stout’s house, appellant said
that she could not believe that Stout had let “[the complainant] hit on me while I’m
pregnant.” Appellant then turned the corner, and Parker saw the complainant
standing by the curb with her fists raised. When appellant turned the corner, “the
speed picked up a little bit and [they] went straight for [the complainant].” 
          Houston Police Officer J. Bosworth testified that he arrived at the scene at
about 5:41 p.m. and saw a large crowd gathered. He explained that the weather was
“probably cloudy” and overcast, but the roads were dry. Appellant repeatedly told
Bosworth that “she had come around the corner and the [complainant] had jumped
out in front of her car and [appellant] didn’t have time to stop.” After appellant told
Bosworth that she had had a confrontation with the complainant earlier in the day, he
stopped questioning her and called for a homicide detective. Bosworth also spoke
with Fields, who told him that appellant’s car had accelerated toward her and the
complainant and that Fields had barely gotten out of the way before also being struck.
          Houston Police Officer J. Kay, a crime scene unit investigator, testified that,
after arriving at the scene at about 7:00 p.m., he took pictures of road marks on the
pavement near appellant’s car because “they depict a vehicle leaving the street,
curving through the grass area and hitting the complainant.” In his opinion, based on
his training, the marks were acceleration marks because “there [was] some kickback
of leaves onto the driveway,” which he testified would result from rotating tires
propelling leaves in the opposite direction from a spinning wheel’s direction, and
because rubber was left on the road. Kay agreed that, in his police report, he had
referred to the marks as “skid marks.” However, he testified that his use of the words
“skid marks” was a mistake and a bad choice of words and that he really meant to say
that the marks were acceleration marks. Houston Police Officer O. Lewis, an
accident investigator, also testified that when he arrived at the scene, he saw “tire
tracks going up” on the ground, and, in his opinion, the mark was an acceleration
mark because no heavy indentations were made in the grassy area, which he testified
would have been present had a car had been braking. 
          Houston Police Officer R. Saenz, an accident reconstructionist, testified that
using a 1999 Toyota Corolla, a similar model to appellant’s car, he attempted to
retrace the path that appellant drove when appellant struck the complainant. In his
opinion, appellant’s car was traveling northbound on Leonora street, made a right-hand turn, proceeded eastward on Glenview, and “for some reason, [appellant] saw
something and turned her vehicle in a different direction” to the southeast, where she
drove her car up a driveway. Then, appellant’s car accelerated, struck the
complainant, and, once the car reached the grassy area, dragged the complainant
across the grassy area to the driveway area, where it came to a stop. Saenz opined
that, if appellant had applied the brakes on her car that “it would have, if not
prevented this, it would have reduced the amount of injury.” Saenz further testified
that the road mark at the scene was an acceleration mark because there was “no build
up of any grass or leaves in front of this mark,” and he explained that he did not see
any evidence of braking or attempts to brake to avoid the collision with the
complainant. However, Saenz “seriously doubt[ed]” that appellant’s car would be
able to leave an acceleration mark, and he could not say that the road marks shown
to him in photographs admitted into evidence were, in fact, tire marks. Michael Estes,
the assistant manager at the central garage that services patrol cars for the Houston
Police Department, testified that, when he examined the brakes on appellant’s car,
they functioned properly. 
          Doctor H. Narula, a Harris County assistant medical examiner, testified that he
performed the complainant’s autopsy. In his opinion, the complainant’s cause of
death was multiple blunt force trauma, which was “consistent with her being run over
by a car.” 
          In her defense, appellant presented the testimony of Vincent Cannady, who told
the jury that he was standing across the street in his parking lot when he saw
appellant’s car strike the complainant. As the complainant walked toward the street
from the sidewalk, Cannady saw appellant turn the corner and attempt to pull into a
parking spot. He then saw the complainant jump in front of appellant’s car and that
appellant tried to weave her car to the left and park on the side of the street. He
explained, however, that the right-hand side of appellant’s car struck the complainant. 
          Kendrich Hines testified that, at Vel Stout’s house, the complainant
“blindsided” appellant, and, after he witnessed the fight between the complainant and
appellant, he drove Michael Stout, the complainant, and Fields to the Seville
Apartments, arriving before appellant. After he parked and exited his car, Hines saw
appellant drive around the corner and that she was attempting to park her car. He also
saw the complainant, who was standing in the driveway of a nearby parking area and
“was cussing, talking about how she was going to whip [appellant] again and stuff
like that.” When appellant attempted to park her car, she tried to turn back into the
street, but the passenger side of her car struck the complainant. Hines then ran across
the street, where he saw Michael Stout push appellant and Fields and another girl
jump on appellant. Hines then helped to lift the car to remove the complainant from
underneath the car. 
          Appellant testified that, when Vel Stout and the complainant came to Jones’s
apartment to discuss the AIDS rumor, appellant told Vel Stout that she did not spread
the rumor. Appellant explained that, after Vel Stout and the complainant left,
appellant was concerned about Vel Stout’s feelings because appellant was five or six
weeks pregnant with Michael Stout’s child and Vel Stout was the child’s
grandmother. Appellant wanted to discuss the matter further with Vel Stout and
drove Parker and Brown to Vel Stout’s house. When they arrived at the house,
appellant saw the complainant, Fields, Michael Stout, and Hines. Fields approached
appellant’s car, spoke to appellant, and walked away. Hines, the complainant, Stout,
and Fields then began to drive away in Hines’s car. Appellant and Brown got out of
the car and approached Vel Stout’s door, but before appellant had a chance to speak
with Vel Stout, Michael Stout, the complainant, Fields, and Hines returned. The
complainant hit appellant from behind, causing appellant to fall backward between
a chair and a fence. After the fight ended, appellant went inside Vel Stout’s house to
fix her contact lens, but when she went back outside, Michael Stout pushed appellant
to the ground. Michael Stout, the complainant, Fields, and Hines then drove away in
Hines’s car. Appellant returned to her car, and she drove Brown and Parker back to
the Seville Apartments. 
          Appellant explained that, during the drive, she was “upset” at Stout and “so
hurt that [Stout] let someone touch [her].” As she approached the corner, she slowed
down to turn and then accelerated after entering the turn. She did not see either the
complainant or Fields standing near the street. However, when she saw Hines on the
other side of the street to her left, she became “a little frightened” because she knew
that the complainant and Michael Stout had left with Hines from Vel Stout’s house.
Appellant started to make a right turn into a parking space to park her car, but the
complainant was in front of appellant’s car on the right-hand side. Appellant swerved
to the left, applied her brakes, and skidded until a curb caused her car to stop, but the
right-hand side of her car struck the complainant. Appellant did not “recall seeing
[the complainant] until she hit [appellant’s] car.” 
          After her car came to a stop, Michael Stout dragged appellant out of the car and
hit her from behind, but Cannady came from across the street and pushed Stout off
of her. Then, Fields and another girl tried to fight with appellant, but appellant broke
free and ran into Jones’s apartment. Appellant then climbed over a patio area and
went to the residence of the Seville’s manager, where appellant called her mother and
police officers. Over the telephone, appellant told a police officer that she “had just
hit someone.” Although appellant testified that she had told Officer Bosworth that
the complainant had “jumped in front of [her] car” and that the complainant “got in
front of [her] car,” she later testified that she did not remember telling Bosworth that
the complainant jumped in front of her car. Appellant further testified that, after
police officers took her to Ben Taub Hospital, she told Houston Homicide Detective
S. Straughter that she was “going 30 and that would be the regular speed limit.”
          Dale King, a forensic scientist employed by Rimkus Consulting Group,
testified that, after examining appellant’s car on September 19, 2003, he could not
conclude that the road marks at the scene came from appellant’s car. In his opinion,
the road marks were skid marks because (1) the white, elongated scrape marks he saw
from photographs of the road appeared to be mostly continuous, which is consistent
with a braking tire with debris caught in a locked tire; (2) the color of the road marks
was lighter at the mark’s beginning and then turned darker, which is also consistent
with braking; and (3) the outer edges of the road marks were darker than in the center,
which is consistent with braking. He also testified that the built-up leaves and dirt at
the scene that he could see in the photographs admitted into evidence indicated that
something was pushed forward, which was consistent with braking. Additionally,
King testified that, when test-driving appellant’s car, he was not able to get
appellant’s car to leave an acceleration mark on the road but was able to get her car
to leave a brake mark. Admission of Evidence
          In her first point of error, appellant argues the trial court erred in admitting into
evidence a letter that she wrote to Michael Stout while he was serving time in jail
about eight months before the incident because the letter was irrelevant and because
its introduction by the State was “an obvious attempt to portray [a]ppellant as a bad,
mean spirited person who uses rough and/or foul language.” Alternatively, appellant
argues that, even if relevant, the letter was inadmissible as minimally probative and
unfairly prejudicial to appellant. See Tex. R. Evid. 403.
              Krystle Brown testified that she wrote a letter to appellant in which Brown
stated that she thought appellant had hit the complainant with her car accidentally. 
However, Brown further testified that she changed her opinion after she read
appellant’s letter to Michael Stout. Thereafter, the State offered appellant’s letter into
evidence, and the trial court admitted the letter over appellant’s objections that it was
unfairly prejudicial. Throughout the letter, appellant described the intensity of her
feelings for Stout and her concern about the possibility of his philandering. The
letter, six pages in length, also discussed the complainant directly in the following
paragraph:
I hope you, forever keep it real with me. Why I say that because you
said in your other letter, when you get out your going to shack Tiemeka
[the complainant] off, well, what your doing is leading her on, by
entertaining her, and writing her. I know you be lonely, but this gal
(Shenae), will be there, through whatever. And to write her and stuff
and when you get out, would be freud and hurt her. I’m not saying I
care, because I don’t have no love for her, but I’m saying you would
hurt me. And can I ask why would you tell her to call me on three-way,
knowing she would no my phone number, I’m not tripping no more, I
was just wondering. I cut for you too much. 
          The standard of review for the admissibility of evidence is abuse of discretion. 
Weatherred v. State, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). An abuse of
discretion occurs where a trial court’s decision lies outside the zone of reasonable
disagreement. Id. In determining whether a trial court has abused its discretion, we
consider whether the court acted arbitrarily or unreasonably and without reference to
guiding rules or principles. Lyles v. State, 850 S.W.2d 497, 502 (Tex. Crim. App.
1993).
              Relevant evidence is evidence that has “any tendency to make the existence of
any fact that is of consequence to the determination of the action more or less
probable than it would be without the evidence.” Tex. R. Evid. 401. Generally, all
relevant evidence is admissible, and evidence that is not relevant is inadmissible. Id.
402. “Evidence need not by itself prove or disprove a particular fact to be relevant;
it is sufficient if the evidence provides a small nudge toward proving or disproving
some fact of consequence.” Stewart v. State, 129 S.W.3d 93, 96 (Tex. Crim. App.
2004).
          Appellant argues that the letter is not relevant because “out of the six pages of
the letter admitted, [a]ppellant only talks about the [c]omplainant on the bottom half
of the first page” and that the “rest of the letter speaks to [a]ppellant’s relationship
with Michael Stout and a[n] unrelated incident having nothing to do with the
[c]omplainant.” 
          However, appellant, throughout the letter, describes her love for Stout, her
desire to have a child by him, and how hurt she was by the possibility of his
philandering, i.e., “I cut for you too much.” Thus, the trial court could have
reasonably concluded that appellant’s own words, as written in the letter, were
probative as to whether appellant had a motive to kill or to cause serious bodily injury
to the complainant. Evidence of motive is relevant and admissible to prove that a
defendant committed the offense alleged. Crane v. State, 786 S.W.2d 338, 349-50
(Tex. Crim. App. 1990). Appellant’s statements in her letter to Michael Stout tended
to make it more probable that she either intended to kill the complainant or to cause
serious bodily injury to the complainant when appellant struck the complainant with
her car because the statements provided evidence that she had a motive to kill or to
cause serious bodily injury to the complainant. Accordingly, we hold that the trial
court did not abuse its discretion in admitting the letter into evidence on the grounds
that it was irrelevant.
          Alternatively, appellant argues that the letter is unfairly prejudicial because
(1) “the degree of relevance and strength of the extraneous evidence (first factor)
weighs in favor of exclusion” because “the State failed to develop any additional
testimony from the witnesses as to how or why” Brown’s opinion changed after
reading the letter; (2) the letter would impress the jury “in some irrational but
nevertheless indelible way” because “the letter was read to the jury purely to portray
[a]ppellant as a bad person who uses foul language”; (3) the State “developed and/or
used the evidence (third factor) every time the opportunity presented itself” and
“exploited every opportunity to paint [a]ppellant as a bad person to distract the jury
from the facts of their case”; and (4) the State did not need the letter because the “two
girls in the car with [a]ppellant at the time of the incident testified and the jury was
presented [with] expert testimony about the markings at the scene.”
              Although relevant, evidence may be excluded if its probative value is
substantially outweighed by the danger of unfair prejudice. Tex. R. Evid. 403. 
However, Rule 403 favors the admissibility of evidence, and the presumption is that
relevant evidence will be more probative than prejudicial. Santellan v. State, 939
S.W.2d 155, 169 (Tex. Crim. App. 1997). Trial courts should favor admission in
close cases, in keeping with the presumption of admissibility of relevant evidence. 
Mozon v. State, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999). The burden is on the
opponent of the proffered evidence to demonstrate the negative attributes of the
evidence and to show how these negative attributes substantially outweigh the
probative value of the evidence. Goldberg v. State, 95 S.W.3d 345, 367 (Tex.
App.—Houston [1st Dist.] 2002, pet. ref’d).
          In determining whether the prejudice of admitting evidence outweighs its
probative value, we consider the following: (1) how compellingly the evidence
makes a fact of consequence more or less probable; (2) the potential the evidence has
to impress the jury in an irrational, but indelible, way; (3) the time the proponent will
need to develop the evidence, during which the jury will be distracted from
consideration of the indicted offense; and (4) the proponent’s need for the evidence
to prove a fact of consequence. Mozon, 991 S.W.2d at 847. Trial courts have wide
latitude in conducting this balancing test, and we will not reverse a trial court whose
ruling was “within the zone of reasonable disagreement.” Wheeler v. State, 67
S.W.3d 879, 888 (Tex. Crim. App. 2002); Montgomery, 810 S.W.2d 372, 391 (Tex.
Crim. App. 1990) (op. on reh’g).
          Here, the prejudice of the letter does not substantially outweigh its probative
value. First, as noted above, the letter compellingly makes a fact of consequence
more or less probable. Appellant’s intent to kill or to cause serious bodily injury to
the complainant was a hotly contested issue at trial. The State offered the letter
written by appellant to Michael Stout, her ex-boyfriend and the father of her unborn
child, to show that appellant had a motive to kill the complainant, with whom
appellant had fought earlier in the afternoon and whom appellant knew also had a
relationship with Stout.
          Second, the letter had little potential to impress the jury in an irrational, but
indelible, way. While the letter could have caused the jury to view appellant as a
“bad person who uses rough and/or foul language,” the jury was allowed to hear
unobjected-to testimony by Brown and Parker of appellant’s use of colloquial
expressions, and the jury was informed that appellant had been five or six weeks
pregnant with Stout’s child at the time of the incident. Furthermore, 13 witnesses
testified over a seven-day period, and over 90 exhibits were admitted into evidence,
including photographs of the complainant’s autopsy. The reporter’s record in this
case consists of eight volumes, with each volume approximately 300 pages in length. 
Brown’s testimony concerning the letter and the publication of the letter consisted
only of approximately 15 pages of the reporter’s record. 
          Third, after reviewing the record, the amount of time to develop the evidence
appeared to be minimal. Therefore, we cannot conclude that the jury was unduly
distracted from the indicted offense of murder. 
          Finally, appellant’s description of the intensity of her feelings for Stout and her
concern about the possibility of his philandering expressed throughout the letter put
the homicide in context. Appellant’s letter served to show that appellant and Stout
had an erratic, yet long-standing, relationship and that appellant knew Stout also had
a relationship with the complainant that appellant wanted him to end. This evidence
created the inference that appellant, who was pregnant with Stout’s child at the time
of the incident, had a motive and the intent to kill or to cause serious bodily injury to
the complainant at the time of the incident. After reviewing the appropriate factors,
we cannot conclude that the probative value of the evidence is substantially
outweighed by the danger of unfair prejudice. Thus, we hold that the trial court did
not abuse its discretion in admitting the letter into evidence on the grounds that its
probative value was substantially outweighed by the danger of unfair prejudice. 
          We overrule appellant’s first point of error.
Sufficiency of the EvidenceIn her second and third points of error, appellant argues that the evidence was
legally and factually insufficient to support her conviction because the State failed to
present satisfactory evidence that appellant “intended the result that occurred.” 
          We review the legal sufficiency of the evidence by viewing the evidence in the
light most favorable to the verdict to determine if any rational fact finder could have
found the essential elements of the offense beyond a reasonable doubt. King v. State,
29 S.W.3d 556, 562 (Tex. Crim. App. 2000). In a legal sufficiency review, we may
not substitute our own judgment for that of the fact finder. Id.
           In our review of the factual sufficiency of the evidence, we view all of the
evidence neutrally, not in the light most favorable to the verdict, and we will set aside
the verdict “only if the evidence is so weak that the verdict is clearly wrong and
manifestly unjust, or the contrary evidence is so strong that the standard of proof
beyond a reasonable doubt could not have been met.” Escamilla v. State, 143 S.W.3d
814, 817 (Tex. Crim. App. 2004); see Johnson v. State, 23 S.W.3d 1, 6-7 (Tex. Crim.
App. 2000). Although our analysis considers all the evidence presented at trial, the
trier of fact is the exclusive judge of the facts, the credibility of the witnesses, and the
weight to be given to their testimony. Sharp v. State, 707 S.W.2d 611, 614 (Tex.
Crim. App. 1986). Unless the available record clearly reveals that a different result
is appropriate, an appellate court must defer to the jury’s determination concerning
what weight to give contradictory testimonial evidence because this resolution often
turns on an evaluation of the credibility and demeanor of the witnesses, and the jurors
were in attendance when the testimony was delivered. Johnson, 23 S.W.3d at 8.
          A person commits the offense of murder if she (1) intentionally or knowingly
causes the death of an individual or (2) intends to cause serious bodily injury and
commits an act clearly dangerous to human life that causes the death of an individual. 
Tex. Pen. Code Ann. §§ 19.02(b)(1), (2) (Vernon 2003). 
          Proof of a defendant’s mental state must almost always depends upon
circumstantial evidence. Ponce v. State, 127 S.W.3d 107, 109 (Tex. App.—Houston
[1st Dist.] 2003, no pet.). Intent is most often proved through circumstantial evidence
surrounding the crime. Dillon v. State, 574 S.W.2d 92, 94 (Tex. Crim. App. [Panel
Op.] 1978); Dominguez v. State, 125 S.W.3d 755, 761 (Tex. App.—Houston [1st
Dist.] 2003, pet. ref’d). A jury may infer intent from facts that tend to prove its
existence, such as the defendant’s acts, words, and conduct. Dillon, 574 S.W.2d at
94; Dominguez, 125 S.W.3d at 761. 
Legal Sufficiency 
          In regard to legal sufficiency, appellant concedes that both Brown and Parker
testified that appellant increased her speed after turning the corner and then drove
straight toward the area where the complainant was standing. However, appellant
notes that (1) both Cannady and Hines testified that the complainant was standing in
the road when she was struck by appellant’s car, (2) Brown testified that the distance
between appellant’s car and the complainant after appellant turned the corner was 15
feet, and (3) neither Brown nor Parker testified that appellant accelerated after
striking the complainant. Furthermore, appellant notes that, while the State had
photographs of the “tire tracks and/or marks taken at the scene the day of the
incident,” no one “measured, tested, or otherwise analyzed the physical evidence to
circumstantially connect it as evidence of the requisite intent.” Appellant also notes
that Officer Saenz, the State’s accident reconstructionist expert, testified that he
“seriously doubt[ed]” that appellant’s car could leave an acceleration mark. Finally,
appellant notes that “there was a legitimate question as to whether the marks at the
scene even came from [a]ppellant’s car or were related to the incident” because “[t]he
State’s expert testimony was too tenuous and the prosecutors failed to adequately
validate the marks or explain their significance, as it related to the element of intent.”
          However, Brown, Parker, Hines, and appellant testified that, shortly before
appellant struck the complainant with her car, at Vel Stout’s house, appellant
physically fought with the complainant. Brown also testified that, immediately before
the fight occurred, the complainant told appellant that she had “been wanting to whip
that ho for a long time.” Hines testified that the complainant “blindsided” appellant
at Vel Stout’s house. Brown testified that, minutes after the fight, while on the drive
from Vel Stout’s house to the Seville Apartments, appellant stated that she “couldn’t
believe how [Stout] let that whore beat his baby mama like that,” and Parker testified
that appellant stated that she could not believe that Stout “let her hit on me while I’m
pregnant.” Appellant admitted that, on the drive back to the Seville Apartments, she
was “upset” at Stout and that she was “so hurt that [Stout] let someone touch her.” 
Moreover, both Brown and Parker testified that appellant slowed the car to turn the
corner from Leonora street to Glenview street but accelerated after she turned the
corner and that appellant drove straight toward where the complainant was standing. 
Both Brown and Parker testified that appellant was looking toward the complainant
after appellant turned the corner. Also, Brown, Parker, and appellant testified that
appellant was five or six weeks pregnant with Stout’s child at the time appellant
struck the complainant with her car. Additionally, Brown, Parker, and appellant all
testified that they knew that Stout and the complainant also had a relationship. 
Officers Kay and Lewis testified that, based on their own experiences and training,
the road marks at the scene were acceleration marks. Officer Saenz, the State’s
accident reconstruction expert, testified that there was no evidence that appellant had
applied her brakes when her car struck the complainant. Saenz further testified that,
if appellant had applied the brakes on her car, “it would have, if not prevented this,
it would have reduced the amount of injury.” Estes testified that, when he examined
the brakes on appellant’s car, they were functioning properly. 
          Considering this evidence, a rational fact finder could have found, beyond a
reasonable doubt, that appellant either intentionally or knowingly caused the
complainant’s death or intended to cause serious bodily injury to the complainant and
committed an act clearly dangerous to human life that caused the complainant’s 
death. Thus, we hold that the evidence was legally sufficient to support appellant’s
conviction for the offense of murder.
          We overrule appellant’s second point of error.
Factual Sufficiency
          Appellant asserts that the evidence that she discussed in her legal sufficiency
point of error, along with the evidence that she presented in her case-in-chief,
supports a finding that the evidence is factually insufficient to support her conviction. 
Appellant notes that both Brown and Parker testified that their attention was focused
on the complainant when appellant turned the corner, and they also testified that, after
turning the corner, appellant “accelerated a little, but [a]ppellant said nothing and did
nothing else before the car struck the [c]omplainant. ” Appellant also notes that she
testified that, (1) after turning the corner, she first saw Hines’s car and was turning
to park when she saw the complainant in the street; (2) appellant tried to swerve, but
the right-hand side of her car struck the complainant; and (3) her car then hit the curb
and stopped. Appellant notes that both Cannady and Hines “substantiated her
account.” Both Cannady and Hines testified that appellant was attempting to park the
car, but when she saw the complainant, she tried to turn left back into the street, but
the passenger side of her car struck the complainant. Furthermore, appellant asserts
that “[t]here is simply not enough evidence to establish the necessary connection
between the conduct (striking with the car) and the result (the death of the
[c]omplainant).” Appellant further notes that, even if the road marks shown in the
photographs came from appellant’s car, King “clearly testified, under the
circumstances, that the marks found at the scene had to be skid marks.” Officer
Saenz testified that he “seriously doubt[ed]” that appellant’s car could leave
acceleration marks.
          However, Brown, Parker, Hines, and appellant testified that appellant fought
with the complainant shortly before appellant’s car struck the complainant. Brown
and Parker both testified that appellant slowed the car to enter the turn, but then
accelerated after turning the corner and drove straight toward the complainant. Both
Parker and Brown testified that appellant was looking at the complainant after
appellant turned the corner. Brown testified that, minutes after the fight, appellant
stated that she “couldn’t believe how he let that whore beat his baby mama like that,”
Parker testified that appellant stated that she could not believe that Michael Stout “let
her hit on me while I’m pregnant,” and appellant testified that she was “upset” at
Stout and that she was “so hurt that [Stout] let someone touch her.” Officers Lewis
and Kay both testified that the road mark was an acceleration mark. Officer Saenz
testified that there was no evidence that appellant applied her brakes before her car
struck the complainant and that if appellant had applied her brakes, the damage to the
complainant could have been reduced. 
          As the exclusive judges of the facts, the credibility of the witnesses, and the
weight to be given their testimony, the jury was free to believe or disbelieve all or any
part of the State’s witnesses’ or appellant’s witnesses’ testimony. McKinny v. State,
76 S.W.3d 463, 468-69 (Tex. App.—Houston [1st Dist.] 2002, no pet.). Where
conflicting testimony is given, as in this case, it is the exclusive province of the jury
to reconcile conflicts in the evidence. Wesbrook v. State, 29 S.W.3d 103, 111 (Tex.
Crim. App. 2000). Viewing all of this evidence neutrally, we conclude that the
evidence was not so weak that the verdict was clearly wrong or manifestly unjust and
that the contrary evidence was not so strong that the standard of proof beyond a
reasonable doubt could not have been met. Accordingly, we hold that the evidence
was factually sufficient to support the jury’s finding that appellant either intentionally
or knowingly caused the complainant’s death or intended to cause serious bodily
injury to the complainant and committed an act clearly dangerous to human life that
caused the complainant’s death. 
          We overrule appellant’s third point of error. 
Conclusion
          We affirm the judgment of the trial court.
 
 
 
                                                                        Terry Jennings
                                                                        Justice

Panel consists of Justices Taft, Jennings, and Bland.

Do not publish. Tex. R. App. P. 47.2(b).